[No. S109219. May 22, 2003.]

DEPARTMENT OF FINANCE, Plaintiff and Appellant, v.
COMMISSION ON STATE MANDATES, Defendant and Respondent;
KERN HIGH SCHOOL DISTRICT et al., Real Parties in Interest and
Respondents.

**COUNSEL**

Bill Lockyer, Attorney General, Andrea Lynn Hoch, Chief Assistant Attorney General, Manuel M. Medeiros and Louis R. Mauro, Assistant Attorneys

General, Catherine M. Van Aken and Leslie R. Lopez, Deputy Attorneys General, for Plaintiff and Appellant.

Paul M. Starkey, Camille Shelton and Eric D. Feller for Defendant and Respondent.

Jo Anne Sawyerknoll, Jose A. Gonzales and Arthur M. Palkowitz for Real Party in Interest and Respondent San Diego Unified School District.

No appearance by Real Parties in Interest and Respondents Kern High School District and County of Santa Clara.

Ruth Sorensen for California State Association of Counties, City of Buenaventura, City of Carlsbad, City of Dixon, City of Indian Wells, City of La Habra Heights, City of Merced, City of Monterey, City of Plymouth, City and County of San Francisco, City of San Luis Obispo, City of San Pablo, City of Tracy and City of Walnut Creek as Amici Curiae on behalf of Real Parties in Interest and Respondents.

Diana McDonough, Harold M. Freiman, Cynthia A. Schwerin and Lozano Smith for California School Boards Association, through its Education Legal Alliance as Amici Curiae on behalf of Real Parties in Interest and Respondents.

## OPINION

**GEORGE, C. J.**—Article XIII B, section 6, of the California Constitution provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ." (Hereafter article XIII B, section 6.)

Real parties in interest—two public school districts and a county (hereafter claimants)—participate in various education-related programs that are funded by the state and, in some instances, by the federal government. Each of these underlying funded programs in turn requires participating public school districts to establish and utilize specified school councils and advisory committees. Statutory provisions enacted in the mid-1990's require that such school councils and advisory committees provide notice of meetings, and post agendas for those meetings. (See Gov. Code, § 54952; Ed. Code,

§ 35147.) We granted review to determine whether claimants have a right to reimbursement from the state for their costs in complying with these statutory notice and agenda requirements.

We conclude, contrary to the Court of Appeal, that claimants are not entitled to reimbursement under the circumstances presented here. Our conclusion is based on the following determinations:

First, we reject claimants' assertion that they have been legally compelled to incur notice and agenda costs, and hence are entitled to reimbursement from the state, based merely upon the circumstance that the notice and agenda provisions are mandatory elements of education-related programs in which claimants have participated, without regard to whether a claimant's participation in the underlying program is voluntary or compelled. Second, we conclude that as to *eight* of the nine underlying funded programs here at issue, claimants have not been legally compelled to participate in those programs, and hence cannot establish a reimbursable state mandate as to those programs based upon a theory of legal compulsion. Third, assuming (without deciding) that claimants have been legally compelled to participate in *one* of the nine programs, we conclude that claimants nonetheless have no entitlement to reimbursement from the state for such expenses, because they have been free at all relevant times to use funds provided by the state for that program to pay required program expenses—including the notice and agenda costs here at issue.

Finally, we reject claimants' alternative contention that even if they have not been *legally* compelled to participate in the underlying funded programs, as a *practical* matter they have been compelled to do so and hence to incur notice- and agenda-related costs. Although we do not foreclose the possibility that a reimbursable state mandate might be found in circumstances short of legal compulsion—for example, if the state were to impose a substantial penalty (independent of the program funds at issue) upon any local entity that declined to participate in a given program—claimants here faced no such practical compulsion. Instead, although claimants argue that they have had "no true option or choice" other than to participate in the underlying funded educational programs, the asserted compulsion in this case stems only from the circumstance that claimants have found the benefits of various funded programs "too good to refuse"—even though, as a condition of program participation, they have been forced to incur some costs. On the facts presented, the cost of compliance with conditions of participation in these funded programs does not amount to a reimbursable state mandate.

Accordingly, we shall reverse the judgment of the Court of Appeal.

I.

A number of statutes establish various school-related educational programs, such as the School-Based Pupil Motivation and Maintenance Program and Dropout Recovery Act (Ed. Code, § 54720 et seq.), Programs to Encourage Parental Involvement (Ed. Code, § 11500 et seq.), and the federal Indian Education Program (20 U.S.C. § 7421 et seq. [former 25 U.S.C. § 2604 et seq.]). Under these statutes, participating school districts are granted state or federal funds to operate the program, and are required to establish school site councils or advisory committees that help administer the program. Program funding often is substantial—for example, on a statewide basis, funding provided by the state for school improvement programs (see Ed. Code, §§ 52010 et seq., 62000, 62000.2, subd. (b), 62002) for the 1998-1999 fiscal year totaled approximately $394 million. (Cal. Dept. of Ed., Rep., Budget Act of 1998 (Nov. 1998) p. 52.)

In the mid-1990's, the Legislature passed legislation designed to make the operations of the councils and advisory committees related to such programs more open and accessible to the public. First, effective April 1, 1994, the Legislature enacted Government Code section 54952, which expanded the reach of the Ralph M. Brown Act (Brown Act) (Gov. Code, § 54950.5 et seq.)—California's general open meeting law—to apply to all such official local advisory bodies.[1] Second, effective July 21, 1994, Education Code section 35147 superceded Government Code section 54952, with respect to the application of the Brown Act to designated councils and advisory committees. Although the earlier (Government Code) statute had made *all* local government councils and advisory committees subject to *all* provisions of the Brown Act, the later (Education Code) statute generally exempts councils and advisory committees of nine specific programs from compliance with all provisions of the Brown Act, and imposes instead its own separately described requirement that all such councils and advisory committees related to those nine programs be open to the public, provide notice of meetings, and post meeting agendas.[2]

---

[1] Government Code section 54952, a provision of the Brown Act, provides in relevant part: "As used in this chapter, 'legislative body' means: [¶] (a) The governing body of a local agency or any other local body created by state or federal statute. [¶] (b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body. . . ."

[2] Education Code section 35147 provides in relevant part: "(a) Except as specified in this section, any meeting of the councils or committees specified in subdivision (b) is exempt from . . . the Ralph M. Brown Act. . . . [¶] (b) The councils and schoolsite advisory committees established pursuant to Sections 52012, 52065, 52176, and 52852, subdivision (b)

Compliance with these notice and agenda rules in turn imposed various costs on the affected councils and committees. Claimants Kern High School District, San Diego Unified School District, and County of Santa Clara filed "test claims" (see Gov. Code, § 17521) with the Commission on State Mandates (Commission), seeking reimbursement for the costs incurred by school councils and advisory committees in complying with the new statutory notice and agenda requirements. (See generally *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331-333 [285 Cal.Rptr. 66, 814 P.2d 1308] [describing legislative procedures implementing art. XIII B, § 6].)[3] In a statement of decision issued in mid-April 2002, the Commission found in favor of claimants. It concluded that the statutory notice and agenda requirements impose reimbursable state mandates for the costs of preparing meeting agendas, posting agendas, and providing the public an opportunity to address the respective council or committee.

---

of Section 54425, Sections 54444.2, 54724, and 62002.5, and committees formed pursuant to Section 11503 or Section 2604 of Title 25 of the United States Code, are subject to this section. [¶] (c) Any meeting held by a council or committee specified in subdivision (b) shall be open to the public and any member of the public shall be able to address the council or committee during the meeting on any item within the subject matter jurisdiction of the council or committee. Notice of the meeting shall be posted at the schoolsite, or other appropriate place accessible to the public, at least 72 hours before the time set for the meeting. The notice shall specify the date, time, and location of the meeting and contain an agenda describing each item of business to be discussed or acted upon. The council or committee may not take any action on any item of business unless that item appeared on the posted agenda or unless the council or committee members present, by unanimous vote, find that there is a need to take immediate action and that the need for action came to the attention of the council or committee subsequent to the posting of the agenda. . . ."

The nine school site councils and advisory committees specified in subdivision (b), above, were established as part of the following programs: The school improvement program (Ed. Code, § 52010 et seq.; see *id.*, §§ 62000, 62000.2, subd. (b), 62002) [a general program that disburses funds for all aspects of school operation and performance]; the American Indian Early Childhood Education Program (Ed. Code, § 52060 et seq.); the Chacon-Moscone Bilingual-Bicultural Education Act of 1976 (Ed. Code, § 52160 et seq.; see *id.*, 62000, 62000.2, subd. (d)); the School-Based Program Coordination Act (Ed. Code, § 52850 et seq. [a program designed to coordinate various categorical aid programs]); the McAteer Act (Ed. Code, § 54400 et seq. [various compensatory education programs for "disadvantaged minors"]); the Migrant Children Education Programs (Ed. Code, § 54440 et seq.); the School-Based Pupil Motivation and Maintenance Program and Dropout Recovery Act (Ed. Code, § 54720 et seq. [a program designed to address truancy and dropout issues]); the Programs to Encourage Parental Involvement (Ed. Code, § 11500 et seq.); and the federal Indian Education Program (20 U.S.C. § 7421 et seq. [former 25 U.S.C. § 2601 et seq.].)

[3] In December 1994, Santa Clara County filed the first test claim, asserting that Government Code section 54952 imposed a reimbursable state mandate. In December 1995, Kern High School District filed a test claim asserting that Education Code section 35147 imposes a reimbursable state mandate. These two claims were consolidated, and San Diego Unified School District was added as a coclaimant.

Acting through the Department of Finance, the State of California (hereafter Department of Finance or Department) thereafter brought this administrative mandate proceeding under Government Code section 17559, subdivision (b), to challenge the Commission's decision. The San Diego Unified School District took the lead role on behalf of claimants; the Kern High School District and the County of Santa Clara did not appear in the court proceedings below and have not appeared in this court.

In November 2000, the trial court, agreeing with the Commission, denied the mandate petition.[4] The Department of Finance appealed, arguing that the school councils and advisory committees at issue serve categorical aid programs in which school districts participate "voluntarily," often as a condition of receiving state or federal program funds. The Department of Finance asserted that the state has not *compelled* school districts to participate in or accept funding for any of those underlying programs—and hence has not required the establishment of any of the councils and committees that serve the programs. Instead, the Department of Finance argued, the state merely has set out reasonable conditions and rules that must be adhered to if a local entity elects to participate in a program and receive program funding. Accordingly, the Department of Finance asserted, because local entities are not required to undertake or continue to participate in the programs, the state, by enacting Government Code section 54952 and Education Code section 35147, has not imposed a "mandate," as that term is used in article XIII B, section 6. It follows, the Department of Finance asserted, that claimants have no right to reimbursement under article XIII B, section 6.

In a July 2002 decision, the Court of Appeal rejected the position taken by the Department of Finance. The appellate court concluded that a state mandate is established under article XIII B, section 6, when the local governmental entity has "no reasonable alternative" and "no true choice but to participate" in the program, and incurs the additional costs associated with an increased or higher level of service.[5]

We granted review to consider the Court of Appeal's construction of the term "state mandate" as it appears in article XIII B, section 6.

---

[4] The trial court stated: "Two primary issues are raised in this matter. The first issue is whether the 1993 amendments to the Brown Act [that is, enactment of Government Code section 54952] and the 1994 enactment of . . . [Education Code] section 35147 mandate a new program or higher level of service. The Court concludes that they do. The second issue is whether a reimbursable state mandate is created only when an advisory council or committee which is subject to the Brown Act is required by state law. The Court concludes that it is not."

[5] The Court of Appeal also concluded that Government Code section 54952 and Education Code section 35147 establish a "higher level of service" under article XIII B, section 6. We need not and do not review that determination here, and express no view on the validity of that conclusion.

## II.

Article XIII A (adopted by the voters in 1978 as Proposition 13), limits the *taxing* authority of state and local government. Article XIII B (adopted by the voters in 1979 as Proposition 4) limits the *spending* authority of state and local government.

Article XIII B, section 6, provides as follows: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975." Article XIII B became operative on July 1, 1980. (*Id.*, § 10.)

We have observed that article XIII B, section 6, "recognizes that articles XIII A and XIII B severely restrict the taxing and spending powers of local governments. [Citation.] Its purpose is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 [61 Cal.Rptr.2d 134, 931 P.2d 312] (*County of San Diego*).) We also have observed that a reimbursable state mandate does not arise merely because a local entity finds itself bearing an "additional cost" imposed by state law. (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 55-57 [233 Cal.Rptr. 38, 729 P.2d 202].) The additional expense incurred by a local agency or school district arising as an "incidental impact of a law which applied generally to all . . . entities" is not the "type of expense . . . [that] the voters had in mind when they adopted section 6 of article XIII B." (*Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830, 835 [244 Cal.Rptr. 677, 750 P.2d 318]; see also *County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487 [280 Cal.Rptr. 92, 808 P.2d 235]; *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 70 [266 Cal.Rptr. 139, 785 P.2d 522] (*City of Sacramento*).[6])

The focus in many of the prior cases that have addressed article XIII B, section 6, has been upon the meaning of the terms "new program" or

---

[6]As we observed in *City of Sacramento, supra,* 50 Cal.3d at page 70, "extension of the subvention requirements to costs 'incidentally' imposed on local governments would require

"increased level of service." In the present case, we are concerned with the meaning of state "mandate."

## III.

### A.

In its briefs, the Department of Finance asserts that article XIII B, section 6, reflects an intent on the part of the drafters and the electorate to limit reimbursement to costs that are forced upon local governments as a matter of legal compulsion. The Commission's briefs take a similar approach, arguing that reimbursement under the constitutional provision requires a showing that a local entity was "ordered or commanded" to incur added costs. At oral argument, both the Department and the Commission retreated somewhat from these positions, and suggested that legal compulsion may not be a necessary condition of a finding of a reimbursable state mandate in all circumstances. For the reasons explained below, although we shall analyze the legal compulsion issue, we find it unnecessary in this case to decide whether a finding of legal compulsion is *necessary* in order to establish a right to reimbursement under article XIII B, section 6, because we conclude that even if there are some circumstances in which a state mandate may be found in the absence of legal compulsion, the circumstances presented in this case do not constitute such a mandate.

#### 1.

The Department of Finance and the Commission maintain that the drafters of article XIII B, section 6, borrowed that provision's basic idea and structure—and the gist of its "state mandate" language—from then existing statutes. (See generally *Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577-1581 [15 Cal.Rptr.2d 547].) At the time of the drafting and enactment of article XIII B, section 6, former Revenue and Taxation Code section 2231, subdivision (a) (currently Gov. Code, § 17561, subd. (a)) provided: "The state shall reimburse each local agency for all 'costs mandated by the state,' as defined in Section 2207. . . ." And at that same time, former Revenue and Taxation Code section 2207 (currently Gov. Code, § 17514) provided: " 'Costs mandated by the state' means any increased costs which a local agency is required to incur as a result of the

the Legislature to assess the fiscal effect on local agencies of each law of general application. Moreover, it would subject much general legislation to the supermajority vote required to pass a companion local-government revenue bill. Each such necessary appropriation would, in turn, cut into the *state's* article XIII B spending limit. ([Art. XIII B,] § 8, subd. (a).)" We reaffirmed that "nothing in the language, history, or apparent purpose of article XIII B suggested such far-reaching limitations on legitimate state power." (50 Cal.3d at p. 70.)

following: [¶] (a) Any law enacted after January 1, 1973, which mandates a new program or an increased level of service of an existing program . . . ."

As the Department of Finance observes, we frequently have looked to ballot materials in order to inform our understanding of the terms of a measure enacted by the electorate. (See, e.g., *County of Fresno v. State of California, supra,* 53 Cal.3d 482, 487 [reviewing ballot materials concerning art. XIII B].) The Department stresses that the ballot materials pertaining to article XIII B in two places suggested that a state mandate comprises something that a local government entity is required or forced to do. The Legislative Analyst stated: " 'State mandates' are *requirements imposed* on local governments by legislation or executive orders." (Ballot Pamp., Special Statewide Elec. (Nov. 6, 1979) Prop. 4, p. 16, italics added.) Similarly, the measure's proponents stated that the provision would "not allow the state governments to *force* programs on local governments without the state paying for them." (*Id.,* arguments in favor of Prop. 4, p. 18, capitalization removed, italics added.) The Department concludes that the ballot materials fail to suggest that a reimbursable state mandate might be found to exist outside the context of legal compulsion.

The Department of Finance and the Commission also assert that subsequent judicial construction of former Revenue and Taxation Code sections 2231 and 2207—upon which, as just discussed, article XIII B, section 6, apparently was based—suggests that a narrow meaning was accorded the term "state mandate" at the time article XIII B, section 6, was enacted. The Department relies primarily upon *City of Merced v. State of California* (1984) 153 Cal.App.3d 777 [200 Cal.Rptr. 642] (*City of Merced*). Claimants and amici curiae on their behalf assert that *City of Merced* either is distinguishable or was wrongly decided. We proceed to describe *City of Merced* at some length.

In *City of Merced, supra,* 153 Cal.App.3d 777, the city wished either to purchase or to condemn (under its eminent domain authority) certain privately owned real property. If the city were to elect to proceed by eminent domain, it would be required by a then recent enactment (Code Civ. Proc., § 1263.510) to compensate the property owner for loss of its "business goodwill." The city did elect to proceed by eminent domain, and in April 1980 the Merced Superior Court issued a final order in condemnation, directing the city to pay the property owner for the latter's loss of business goodwill. The city did so and then sought reimbursement from the state, arguing that the new statutory requirement that it compensate for business goodwill amounted to a reimbursable state mandate. (*City of Merced,* at p. 780.)

The constitutional reimbursement provision contained in article XIII B, section 6, did not become operative until July 1, 1980. Accordingly, the City of Merced sought reimbursement under the then existing statutory authority—Revenue and Taxation Code former sections 2231 and 2207—which, as noted, apparently had served as the model for the constitutional provision.

The State Board of Control—which at the time exercised the authority now exercised by the Commission—agreed with the City of Merced and found a reimbursable state mandate. (*City of Merced, supra,* 153 Cal.App.3d 777, 780.) The city's approved claim for reimbursement "was included, along with other similar claims, as a [budget] line item in chapter 1090, Statutes of 1981." (*Ibid.*) The Legislature, however, refused to authorize the reimbursement, and directed the board not to accept, or submit, any future claim for reimbursement for business goodwill costs. (*Ibid.*)

The City of Merced then sought a writ of mandate commanding the Legislature to provide reimbursement. The trial court denied that request, and the Court of Appeal affirmed. The court concluded that, as a matter of law, the city's increased costs flowing from its election to condemn the property did not constitute a reimbursable state mandate. (*City of Merced, supra,* 153 Cal.App.3d 777, 781-783.) The court reasoned: "[W]hether a city or county decides to exercise eminent domain is, essentially, an option of the city or county, rather than a mandate of the state. The fundamental concept is that the city or county is not required to exercise eminent domain. If, however, the power of eminent domain is exercised, then the city will be required to pay for loss of goodwill. Thus, payment for loss of goodwill is not a state-mandated cost." (*Id.,* at p. 783.)

The court in *City of Merced, supra,* 153 Cal.App.3d 777, found its construction of former Revenue and Taxation Code sections 2231 and 2207 —as those statutory provisions read at the time they served as the model for article XIII B, section 6—to be confirmed by the subsequent legislative action amending former Revenue and Taxation Code section 2207 (and related former section 2207.5). As the court explained: ". . . Senate Bill No. 90 (Russell), 1979-1980 Regular Session . . . added Revenue and Taxation Code section 2207, subdivision (h): [¶] ' "Costs mandated by the state" means any increased costs which a local agency is required to incur as the result of the following: [¶] . . . [¶] (h) Any statute enacted after January 1, 1973, or executive order issued after January 1, 1973, which *adds new requirements to an existing optional program or service* and thereby increases the cost of such program or service *if the local agencies have no reasonable alternatives other than to continue the optional program.*' " (*City of Merced, supra,* 153 Cal.App.3d 777, 783-784, italics added.)

(Of relevance here, Senate Bill No. 90 (1979-1980 Reg. Sess.) also added a substantively identical provision to former Revenue and Taxation Code section 2207.5—a specialized section that addressed reimbursable state mandates as they related to a school district.)[7]

The court in *City of Merced* continued: "Senate Bill No. 90 became effective on July 1, 1981, [more than a year] after plaintiff incurred the cost of business goodwill for which it seeks reimbursement. Subdivision (h) appears to have been included in the bill to provide for reimbursement of increased costs in an optional program such as eminent domain when the local agency has no reasonable alternative to eminent domain. The legislative history of Senate Bill No. 90 supports the conclusion that subdivision (h) was added to Revenue and Taxation Code section 2207 *to extend state liability rather than to clarify existing law.*" (*City of Merced, supra,* 153 Cal.App.3d 777, 784, italics added.)

After examining two legislative committee reports,[8] the court in *City of Merced, supra,* 153 Cal.App.3d 777, asserted that they "characterize Senate Bill No. 90 as expanding the definition of local reimbursable costs. The Legislative Analyst's Report . . . on Senate Bill No. 90 similarly includes a statement that the bill expands the definition of state-mandated costs. Such characterizations of the purpose of Senate Bill No. 90 are consistent only with the conclusion that, *until that bill was enacted, increased costs incurred in an optional program such as eminent domain were not state mandated.* Thus the cost of business goodwill for which plaintiff was required [by Code of Civil Procedure, section 1263.510] to pay in April 1980, was not a state-mandated cost. It follows that the trial court properly denied the

---

[7]Revised section 2207.5 provided that " '[c]osts mandated by the state' means any increased costs which a school district is required to incur as a result of . . . [¶] . . . [¶] (h) Any statute enacted after January 1, 1973, or executive order issued after January 1, 1978, which adds new requirements to an existing optional program or service and thereby increases the cost of such program or service *if the school districts have no reasonable alternatives other than to continue the optional program.*" (Stats. 1980, ch. 1256, § 5, pp. 4248-4249, eff. July 1, 1981, italics added.)

[8]The court in *City of Merced* asserted: "The Report of the Assembly Revenue and Taxation Committee . . . includes a statement: '*SB 90* further defines "mandated costs" in Sections 4 and 5 to include the following: [¶] . . . [¶] e. Where a statute or executive order adds *new requirements to an existing optional program,* which increases costs if the local agency has no reasonable alternative than to continue that optional program.' (Rep., p. 1, italics in original.) [¶] Additionally, the Ways and Means Committee's Staff Analysis . . . notes that Senate Bill No. 90: 'Expands the definition of *local* reimbursable costs mandated and paid by the state to include: [¶] . . . [¶] e. Statutes or executive orders adding *new requirements to an existing optional program,* which increases costs if the local agency has no reasonable alternative than to continue that optional program.' (P. 2, italics in original.)" (*City of Merced, supra,* 153 Cal.App.3d at p. 784.)

petition for a writ of mandamus to compel payment of that cost." (*City of Merced, supra,* 153 Cal.App.3d 777, 785, italics added.)

In other words, the court in *City of Merced* concluded that former Revenue and Taxation Code sections 2231 and 2207, as they read at the time they served as the model for article XIII B, section 6, contemplated a narrow definition of reimbursable state mandate, and not the subsequently expanded definition of reimbursable state mandate found in the 1981 amendments to the Revenue and Taxation Code.[9]

A few months after the Court of Appeal filed its opinion in *City of Merced, supra,* 153 Cal.App.3d 777, the Legislature overhauled the law pertaining to state mandates and reimbursements by amending both the Revenue and Taxation Code and the Government Code. (Stats. 1984, ch. 1459, p. 5113.) The Department of Finance and the Commission assert that two aspects of the legislative overhaul are particularly relevant to the issue we address here.

First, the Department of Finance and the Commission assert that the Legislature enacted a new section of the Government Code—section 17514—in order to implement the reimbursable-state-mandate directive of article XIII B, section 6.[10] The Department and the Commission assert that in enacting that provision, the Legislature readopted the original, *narrow* definition of reimbursable state mandate found in the initial versions of former Revenue and Taxation Code section 2207—which, the Department and the Commission maintain, existed at the time article XIII B, section 6, was drafted and adopted, and which defined "costs mandated by the state" as those "which a local agency is *required* to incur." (See Stats. 1975, ch. 486, § 1.8, p. 997 [Rev. & Tax. Code, former § 2207]; Stats. 1977, ch. 1135, § 5, p. 3646 [Rev. & Tax. Code, former § 2207]; Stats. 1984, ch. 1459, § 1, p. 5114 [Gov. Code, § 17514], italics added.) This same statutory language also had been recently construed at that time in *City of Merced, supra,* 153 Cal.App.3d 777, as recognizing as a reimbursable state mandate only that imposed when the local entity is legally compelled to engage in the underlying practice or program.

---

[9]We need not, and do not, decide whether the court in *City of Merced, supra,* 153 Cal.App.3d 777, correctly characterized the statutory history of the 1981 amendments to the Revenue and Taxation Code.

[10]Government Code section 17514 reads: " 'Costs mandated by the state' means any increased costs which a local agency or school district is *required* to incur after July 1, 1980, as a result of any statute enacted on or after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution." (Italics added.)

Second, the Department of Finance and the Commission observe, in enacting Government Code section 17514, the Legislature also provided that the use of the broader definition contained in the *amended* versions of Revenue and Taxation Code former sections 2207 and 2207.5 (which became effective July 1, 1981) should be phased out, but that the definition could be used to determine claims that arose prior to 1985. (See Stats. 1984, ch. 1459, § 1, p. 5123; 68 Ops.Cal.Atty.Gen. 224 (1985).)

In other words, the Department of Finance and the Commission assert, in the Legislature's 1984 overhaul of the statutory scheme implementing article XIII B, section 6, the Legislature embraced and codified the narrow definition of reimbursable state mandate set out in former Revenue and Taxation Code section 2207 (and construed in *City of Merced*) as the appropriate test in implementing the constitutional provision. Moreover, the Department and the Commission maintain, the Legislature limited the continued use of the broader definition of a statutorily imposed reimbursable state mandate (set out in the amendments to former Revenue and Taxation Code sections 2207 and 2207.5, effective in mid-1981) to a small and ever-decreasing number of cases. Five years later, the Legislature repealed former Revenue and Taxation Code sections 2207 and 2207.5 (see Stats. 1989, ch. 589, §§ 7 & 8, p. 1978)—thereby finally discarding the broad definition of statutorily imposed reimbursable state mandate found in subdivision (h) of each of those statutes.

As noted above, the Department of Finance and the Commission assert in their briefs that based upon the language of article XIII B, section 6, and the statutory and case law history described above, the drafters and the electorate must have intended that a reimbursable state mandate arises only if a local entity is "required" or "commanded" —that is, legally compelled—to participate in a program (or to provide a service) that, in turn, leads unavoidably to increasing the costs incurred by the entity. (*City of Merced, supra,* 153 Cal.App.3d 777, 783; see also *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155, 174 [275 Cal.Rptr. 449] [construing the term "mandates," for purposes of art. XIII B, § 6, "in the ordinary sense of 'orders' or 'commands' "]; *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1284 [101 Cal.Rptr.2d 784] (*County of Sonoma*) [Legislature's interpretation of art. XIII B, § 6, in Gov. Code, 17514, as limited to "costs which a . . . school district is *required to incur*" is entitled to great weight].)[11]

[11]Although, as described immediately below (in pt. III.A.2.), the Commission attempts to defend on other grounds its determination below in favor of claimants, the Commission

2.

Claimants and amici curiae on their behalf assert that even if "legal compulsion" is the governing standard, they meet that test because, they argue, claimants have been legally compelled to incur compliance costs under Government Code section 54952 and Education Code section 35147, subdivision (c). The Commission—but not the Department—supports claimants' proposed application of the legal compulsion test.

In so arguing, claimants focus upon the circumstance that a school district *that participates* in one of the underlying programs listed in Education Code section 35147, subdivision (b), must comply with program requirements, including the statutory notice and agenda obligations, set out in Government Code section 54952 and Education Code section 35147, subdivision (c). Claimants assert: "[O]nce [a district] participates in one of the educational programs at issue, it does not thereafter have the option of performing that activity in a manner that avoids incurring costs mandated by amended Government Code section 54952 and Education Code section 35147."

The Department of Finance, relying upon *City of Merced, supra,* 153 Cal.App.3d 777, asserts that claimants err by focusing upon a school district's legal obligation to comply with program conditions, rather than focusing upon whether the school district has a legal obligation to participate in the underlying program to which the conditions attach. As suggested above, the core point articulated by the court in *City of Merced* is that activities undertaken at the option or discretion of a local government entity (that is, actions undertaken without any legal compulsion or threat of penalty for nonparticipation) do not trigger a state mandate and hence do not require reimbursement of funds—even if the local entity is obliged to incur costs as a result of its discretionary decision to participate in a particular program or practice. (*Id.,* at p. 783.) Claimants concede that *City of Merced* conflicts with their contrary view, but they assert that the opinion is distinguishable and ask us to decline to follow, or extend, that decision.

Claimants stress—as we acknowledged above—that *City of Merced, supra,* 153 Cal.App.3d 777, was decided in the context of an eminent domain proceeding, and that the appellate court was engaged in construing the *statutory* reimbursement scheme rather than article XIII B, section 6. Claimants also assert that although the City of Merced had discretion whether or

strongly disputes the Court of Appeal's broad interpretation of state mandate as encompassing circumstances in which a local entity is not "ordered or commanded" to perform a task that in turn requires it to incur additional costs.

not to exercise its power of eminent domain, and was under no compulsion to do so, in the present case "school site council and advisory committee meetings cannot be held in a manner that avoids application of [the requirements of] Government Code section 54952 and Education Code section 35147."

The points relied upon by claimants neither call into doubt nor persuasively distinguish *City of Merced, supra,* 153 Cal.App.3d 777. The truer analogy between that case and the present case is this: In *City of Merced,* the city was under no legal compulsion to resort to eminent domain—but when it elected to employ that means of acquiring property, its obligation to compensate for lost business goodwill was not a reimbursable state mandate, because the city was not required to employ eminent domain in the first place. Here as well, if a school district elects to participate in or continue participation in any underlying *voluntary* education-related funded program, the district's obligation to comply with the notice and agenda requirements related to that program does not constitute a reimbursable state mandate.[12]

We therefore reject claimants' assertion that merely because they participate in one or more of the various education-related funded programs here at issue, the costs they incurred in complying with program conditions have been legally compelled and hence constitute reimbursable state mandates. We instead agree with the Department of Finance, and with *City of Merced, supra,* 153 Cal.App.3d 777, that the proper focus under a legal compulsion inquiry is upon the nature of claimants' participation in the underlying programs themselves.

3.

Turning to that question—and without deciding whether a finding of legal compulsion to participate in an underlying program is *necessary* in order to establish a right to reimbursement under article XIII B, section 6—we

---

[12]The Commission further attempts to distinguish *City of Merced, supra,* 153 Cal.App.3d 777, by observing that the eminent domain statute at issue in that case made clear, in the *same* statute that imposed the requirement that an entity employing eminent domain also compensate for lost business goodwill, the discretionary nature of the decision whether to acquire property by purchase or instead by eminent domain. The Commission argues that no such express statement concerning local government discretion is set out in the statutes here at issue. As we explain *post,* part III.A.3.a., however, the underlying program statutes at issue in this case (with one possible exception—see *post,* pt. III.A.3.b.) make it clear that school districts retain the discretion not to participate in any given underlying program—and, as we explain *post,* footnote 22, the circumstance that the notice and agenda requirements of these elective programs were enacted *after* claimants first chose to participate in the programs does not make claimants' choice to continue to participate in those programs any less voluntary.

conclude, upon review of the applicable statutes, that claimants are, and have been, free from legal compulsion as to eight of the nine underlying funded programs here at issue. As to one of the funded programs, we shall assume, for purposes of analysis, that a district's participation in the program is in fact legally compelled.

a.

It appears to be conceded that, as to most of the nine education-related funded programs at issue, school districts are not legally compelled to participate in those programs. For example, the American Indian Early Childhood Education Program (Ed. Code, § 52060 et seq.), which implements projects designed to develop and test educational models to increase reading and math competence of students in preschool and early grades, states that school districts "may apply" to be included in the project (*id.,* § 52063) and, if accepted to participate, will receive program funding (*id.,* § 52062). Education Code section 52065 in turn states that each school district that receives funds provided by section 52062 "shall establish a districtwide American Indian advisory committee for American Indian early childhood education." Plainly, a school district's initial and continued participation in the program is voluntary, and the obligation to establish or maintain an advisory committee arises only if the district elects to participate in, or continue to participate in, the program. Although the language of most of the other implementing statutes varies, they generally follow this same approach, with the same result: Participation in most of the programs listed in Education Code section 35147 is voluntary, and the obligation to establish or maintain a site council or advisory committee arises only if a district elects to participate in, or continue to participate in, the particular program.

Although *claimants* do not assert that they have been legally compelled to participate in *any* underlying program for which they have sought reimbursement for their compliance costs—and, indeed, their briefing suggests the opposite[13] —the Commission and amicus curiae Education Legal Alliance assert that the school improvement program (a "sunsetted," but still funded, program that disburses funds for all aspects of school operation and performance; Ed. Code, §§ 52012 et seq., 62000, 62000.2, subd. (b), 62002) legally compels school districts to establish site councils without regard to whether the district participates in the underlying funded program to which the site councils apply. The Commission and amici curiae rely upon Education Code section 52010, which states in relevant part: "*With the exception of*

---

[13]Claimants at one point characterize themselves as having "*decided* to participate in the programs listed in Education Code section 35147." (Italics in added.)

*subdivisions (a) and (b) of Section 52011,* the provisions of this chapter shall apply only to school districts and schools which participate in school improvement programs authorized by this article." (Italics added.) Section 52011, subdivision (b), in turn provides that "each school district shall: [¶] . . . [¶] (b) *Adopt policies* to ensure that prior to scheduled phase-in, a school site council as described in Section 52012 is established at each school site to consider whether or not it wishes the local school to participate in the school improvement program." (Italics added.)

The Commission and amici curiae read these provisions as requiring all schools and school districts throughout the state to "establish a school site council even if the school [or district] does not participate in the school improvement program." We disagree. Reasonably construed, the statutes require only that a school district adopt "policies" (i.e., a *plan* ) "to ensure" that *if* the district elects to participate in the School Improvement Program, a school site council *will,* "prior to phase-in" of the districtwide program, exist at each school, so that each individual school will be able to decide whether it wishes to participate in the district's program. In other words, the statutes require that districts adopt policies or plans for school site councils—but the statutes do not require that districts adopt councils themselves unless the district first elects to participate in the underlying program.[14]

We therefore conclude that, as to eight of the nine funded programs, the statutory notice and agenda obligations exist and apply to claimants only because they have *elected* to participate in, or continue to participate in, the various underlying funded programs—and hence to incur notice and agenda costs that are a condition of program participation. Accordingly, no reimbursable state mandate exists with regard to any of these programs based upon a theory that such costs were incurred under legal compulsion.[15]

---

[14]Amicus curiae California School Boards Association suggests that provisions of two other programs—the School-Based Program Coordination Act (Ed. Code, § 52850 et seq.) and the School-Based Pupil Motivation and Maintenance Program and Dropout Recovery Act (Ed. Code, § 54720 et seq.)—require that site councils be established, whether or not the school district participates in the underlying program. In both instances, the statutes make it clear that "prior to a school beginning to develop a [program] plan," the district first must establish a local school site council that in turn will "consider whether or not it wishes the local school to participate in the" program. Amicus curiae misreads the statutes; in both instances, the statutes make it clear that these requirements apply "only to school districts and schools *which participate in*" the respective programs (see Ed. Code, §§ 52850, 54722, italics added), and each statutory scheme provides that school site councils "shall be established at each school *which participates in*" the program. (*Id.,* §§ 52852, 54722, italics added.)

[15]In this case, we have no occasion to decide whether a reimbursable state mandate would arise in a situation in which a local entity voluntarily has elected to participate in a program but also has committed to continue its participation for a specified number of years, and the

b.

The Commission and amicus curiae Education Legal Alliance also assert that the Chacon-Moscone Bilingual-Bicultural Education Act of 1976 (another "sunsetted," but still funded, program; Ed. Code, §§ 52160 et seq., 62000, 62000.2, subd. (d), 62002) legally compels school districts to establish advisory committees, regardless whether the district participates in the underlying funded program to which the advisory committees apply. The Commission and amicus curiae rely upon Education Code section 52176's command that each school district with more than 50 pupils of limited English language proficiency, and each school within that district with more than 20 pupils of such proficiency, "*shall* establish a districtwide [or individual school site] advisory committee on bilingual education." (*Id.*, subds. (a) & (b), italics added.)

The Department of Finance responds that because the Chacon-Moscone Bilingual-Bicultural Education program sunsetted in 1987, school districts that have participated in that program since that date have done so not as a matter of legal compulsion, but by their own choice made when they applied for and were granted such program funds.

We note some support for the Department's view. Education Code section 64000 et seq., which governs the funding application process, includes the "sunsetted" Chacon-Moscone Bilingual-Bicultural Education program as one of many optional programs for which a district *may* seek funding. (*Id.*, subd. (a)(4).) But, the Commission argues, another statutory provision suggests that Chacon-Moscone Bilingual-Bicultural Education program advisory committees are mandatory in any event. The Commission notes that section 62002.5 provides that advisory committees "which are in existence pursuant to statutes or regulations as of January 1, 1979, *shall continue* subsequent to termination of funding for the programs sunsetted by this chapter." (Italics added.)

We need not, and do not, determine whether claimants have been legally compelled to participate in the Chacon-Moscone Bilingual-Bicultural Education program, or to maintain a related advisory committee. Even if we assume for purposes of analysis that claimants have been legally compelled to participate in the Chacon-Moscone Bilingual-Bicultural Education program, we nevertheless conclude that under the circumstances here presented,

state imposes additional requirements at a time when the local entity is not free to end its participation.

the costs necessarily incurred in complying with the notice and agenda requirements under that funded program do not entitle claimants to obtain reimbursement under article XIII B, section 6, because the state, in providing program funds to claimants, already has provided funds that may be used to cover the necessary notice- and agenda-related expenses.

We note that, based upon the evaluations made by the Commission, the costs associated with the notice and agenda requirements at issue in this case appear rather modest.[16] And, even more significantly, we have found nothing to suggest that a school district is precluded from using a portion of the funds obtained from the state for the implementation of the underlying funded program to pay the associated notice and agenda costs. Indeed, the Chacon-Moscone Bilingual-Bicultural Education program explicitly authorizes school districts to do so. (See Ed. Code, § 52168, subd. (b) ["School districts may claim funds appropriated for purposes of this article for expenditures in, but not limited to, the following categories: [¶] . . . [¶] (6) Reasonable district administrative expenses . . . ."].) We believe it is plain that the costs of complying with program-related notice and agenda requirements qualify as "[r]easonable district administrative expenses." Therefore, even if we assume for purposes of analysis that school districts have been legally compelled to participate in the funded Chacon-Moscone Bilingual-Bicultural Education program, we view the state's provision of program funding as satisfying, in advance, any reimbursement requirement.

It is conceivable, with regard to some programs, that increased compliance costs imposed by the state might become so great—or funded program grants might become so diminished—that funded program benefits would not cover the compliance costs, or that expenditure of granted program funds on administrative costs might violate a spending limitation set out in applicable regulations or statutes. In those circumstances, a compulsory program participant likely would be able to establish the existence of a reimbursable

[16]Costs of compliance with the notice and agenda requirements have been estimated as amounting to approximately $90 per meeting for the 1994-1995 fiscal year, and incrementally larger amounts in subsequent years, up to $106 per meeting for the 2000-2001 fiscal year, for each committee or advisory council. (See State Controller, *State Mandated Costs Claiming Instrns.* No. 2001-08, School Site Councils and Brown Act Reform (June 4, 2001), Parameters and Guidelines (Mar. 29, 2001) [and implementing forms].) Under these formulae, a district that has 10 schools, each with one council or advisory committee that meets 10 times a year, would be forced to incur approximately $9,000 to $10,000 in costs to comply with statutory notice and agenda requirements. Presumably, such costs are minimal relative to the funds allocated by the state to the school district under these programs. (We hereby grant the Commission's request that we take judicial notice of these and related documents, and of the Commission's December 13, 2001 Statewide Cost Estimate for reimbursement to school districts of notice- and agenda-related expenses.)

state mandate under article XIII B, section 6. But that certainly is not the situation faced by claimants in this case. At most, claimants, by being compelled to incur notice and agenda compliance costs—and pay those costs from program funds—have suffered a relatively minor diminution of program funds available to them for substantive program purposes. The circumstance that the program funds claimants may have wished to use exclusively for substantive program activities are thereby reduced, does not in itself transform the related costs into a reimbursable state mandate. (See *County of Sonoma, supra,* 84 Cal.App.4th 1264 [art. XIII B, § 6, provides no right of reimbursement when the state *reduces* revenue granted to local government].) Nor is there any reason to believe that use of granted program funds to pay the relatively modest costs here at issue would violate any applicable spending limitation.[17]

We therefore conclude that because claimants are and have been free to use funds from the Chacon-Moscone Bilingual-Bicultural Education program to pay required program expenses (including the notice and agenda costs here at issue), claimants are not entitled under article XIII B, section 6, to reimbursement from the state for such expenses.

## B.

▮▮▮ Claimants contend that even if they have not been *legally compelled* to participate in most of the programs listed in Education Code section 35147, subdivision (b), and hence have not been *legally required* to incur the related notice and agenda costs, they nevertheless have been compelled as a practical matter to participate in those programs and hence to incur such costs. Claimants assert that school districts have "had no true option or choice but to participate in these [underlying education-related] programs. *This absence of a reasonable alternative to participation is a de facto mandate.*" As explained below, on the facts of this case, we disagree.

---

[17]With regard to the Chacon-Moscone Bilingual-Bicultural Education program, claimants assert that "[s]tate regulations place a ceiling on the amount of program funds that may be expended for indirect costs at three percent of the district's funding . . . ." (See Cal. Code Regs., tit. 5, §§ 3900, subd. (g) & 3947, subd. (a).) As the Department observes, applicable statutory provisions appear to set the limit for such expenses for the *same* program at no more than 15 percent of granted program funds. (See Ed. Code, §§ 63000, subd. (d), 63001.) Even assuming, for purposes of analysis, that the regulation, and not the statute, applies with regard to this program, it seems clear that the notice and agenda costs here at issue fall far below 3 percent of granted program funds. Indeed, claimants concede: "The notice and agenda costs at issue are administrative costs that appear to fall within [the regulatory] provisions."

1.

Claimants and amici curiae supporting them, relying upon this court's broad interpretation of the federal mandate provision of article XIII B, section 9,[18] in *City of Sacramento, supra*, 50 Cal.3d 51, 70-76, assert that we should recognize and endorse such a broader construction of section 6 of that article—a construction that does not limit the definition of a reimbursable state mandate to circumstances of *legal* compulsion.

In *City of Sacramento, supra*, 50 Cal.3d 51, we considered whether various federal "incentives" for states to extend unemployment insurance coverage to all public employees constituted a reimbursable state mandate under article XIII B, section 6, or a federal mandate within the meaning of article XIII B, section 9.

We concluded in *City of Sacramento, supra*, 50 Cal.3d 51, that there was no reimbursable state mandate under article XIII B, section 6, because the implementing state legislation did not impose any new or increased "program or service," or "unique" requirement, upon local entities. (*City of Sacramento*, at pp. 66-70.)

Turning to the question whether the state legislation constituted a "federal mandate" under article XIII B, section 9, we acknowledged in *City of Sacramento, supra*, 50 Cal.3d 51, that there was no legal compulsion requiring the states to participate in the federal plan to extend unemployment insurance coverage to all public employees. We nevertheless found that the costs related to the program constituted a federal mandate, for purposes of article XIII B, section 9. Our opinion concluded that because the financial consequences to the state and its residents of failing to participate in the federal plan were so onerous and punitive—we characterized the consequences as amounting to "certain and severe federal penalties" including "double . . . taxation" and other "draconian" measures (*City of Sacramento*, at p. 74)—as a practical matter, for purposes of article XIII B, section 9, the state was mandated to participate in the federal plan to extend unemployment insurance coverage.

---

[18]That provision states: " 'Appropriations subject to limitation' for each entity of government do not include: [¶] . . . [¶] (b) Appropriations required to comply with mandates of the courts or the federal government which, without discretion, require an expenditure for additional services or which unavoidably make the provision of existing services more costly."

Claimants, echoing the reasoning of the Court of Appeal below, assert that because this court in *City of Sacramento, supra,* 50 Cal.3d 51, broadly construed the term "federal mandate"—to include not only the situation in which a state or local entity is itself legally compelled to participate in a program and thereby incur costs, but also the situation in which the governmental entity's participation in the federal program is the coerced result of severe penalties that would be imposed for noncompliance—consistency requires that we afford a similarly broad construction to the concept of a state mandate. In other words, claimants argue, the word "mandate," used in two separate sections of article XIII B, should not be given two different meanings.

The Department and the Commission disagree. They assert that, to begin with, a finding of a *federal mandate* under section 9 of article XIII B has a wholly different purpose and effect as compared with a finding of a *state mandate* under section 6 of that article. The Department and the Commission argue that although a finding of a state mandate may result in reimbursement from the state to a local entity for costs incurred by the local entity, expenditures made in order to comply with a federal mandate are excluded from the constitutional spending cap imposed by article XIII B upon any affected state or local entity, because such expenditures are not considered to be an exercise of the state or local authority's discretionary spending authority.

Moreover, the Department and the Commission assert, our conclusion in *City of Sacramento, supra,* 50 Cal.3d 51, regarding the proper construction of article XIII B, *section 9,* relied upon "crucial facts" (*City of Sacramento,* at p. 73) that do not pertain to the wholly separate issue that we face here—the proper interpretation of article XIII B, *section 6.* They observe that, as we explained in *City of Sacramento,* when article XIII B was enacted: "First, the power of the federal government to impose its direct regulatory will on state and local agencies was *then* sharply in doubt.[19] Second, in conformity with this principle, the vast bulk of cost-producing federal influence on government at the state and local levels was by inducement or incentive rather than direct [legal] compulsion. That remains so to this day. [¶] Thus, if article XIII B's reference to 'federal mandates' were limited to strict legal compulsion by the federal government, it would have been largely superfluous. It is well settled that 'constitutional . . . enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people. [Citations.] . . . .' (*Amador Valley*

---

[19]See discussion in *City of Sacramento, supra,* 50 Cal.3d at pages 71-73.

*Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) While '[a] constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words[,] [citation] [, t]he literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]' (*Ibid.*)" (*City of Sacramento, supra,* 50 Cal.3d 51, 73, fns. omitted.)

The Department of Finance and the Commission argue that these factors have no bearing upon the proper interpretation of what constitutes a state mandate under article XIII B, section 6. ■■ ■ They assert that, unlike the federal government, which for a time was severely restricted in its ability to directly impose legal requirements upon the states (see *City of Sacramento, supra,* 50 Cal.3d 51, 71-73), the State of California has suffered no such restriction, vis-à-vis local government entities, except in matters involving purely local affairs.[20] Accordingly, the Department and the Commission argue, in contrast with the situation we faced when construing article XIII B, section 9, we would not render superfluous the restriction in section 6 of that article, were we narrowly to interpret its term "mandate" to include only programs in which local entities are legally compelled to participate.

We find it unnecessary to resolve whether our reasoning in *City of Sacramento, supra,* 50 Cal.3d 51, applies with regard to the proper interpretation of the term "state mandate" in section 6 of article XIII B. Even assuming, for purposes of analysis only, that our construction of the term "federal mandate" in *City of Sacramento, supra,* 50 Cal.3d 51, applies equally in the context of article XIII, section 6, for reasons set out below we conclude that, contrary to the situation we described in that case, claimants here have not faced "certain and severe . . . penalties" such as "double . . . taxation" and other "draconian" consequences (*City of Sacramento, supra,* 50 Cal.3d at 'p. 74), and hence have not been "mandated," under article XIII, section 6, to incur increased costs.

2.

 As we observed in *County of San Diego, supra,* 15 Cal.4th 68, 81, article XIII B, section 6's "purpose is to preclude the state from shifting

[20]Unlike the federal-state relationship, sovereignty is not an issue between state and local governments. Claimant school districts are agencies of the state, and not separate or distinct political entities. (See *California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1524 [7 Cal.Rptr.2d 699].)

financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities." In light of that purpose, we do not foreclose the possibility that a reimbursable state mandate under article XIII B, section 6, properly might be found in some circumstances in which a local entity is not legally compelled to participate in a program that requires it to expend additional funds.

As noted, claimants argue that they have had "no true option or choice" but to participate in the various programs here at issue, and hence to incur the various costs of compliance, and that "the absence of a reasonable alternative to participation is a de facto [reimbursable state] mandate." In the same vein, amici curiae on behalf of claimants emphasize that as a practical matter, many school districts depend upon categorical funding for various programs. Amicus curiae California State Association of Counties asks us to interpret article XIII B, section 6, as providing state reimbursement for programs that are "*indirectly* state mandated." (Italics added.) Amicus curiae Education Legal Alliance goes so far as to assert that unless we recognize a right to reimbursement for costs such as those here at issue, "California schools could be forced to [forgo] participation in important categorical programs that supply necessary financial and educational support to those segments of the student population that need the most assistance. Alternatively, California schools could be forced to cut other student programs or services to fund these procedural requirements."

The record in the case before us does not support claimants' characterization of the circumstances in which they have been forced to operate, and provides no basis for resolving the accuracy of amici curiae's warnings and predictions. Indeed, we are skeptical of the assertions of claimants and amici curiae.

As observed *ante* (fn. 16), the costs associated with the notice and agenda requirements at issue in this case appear rather modest. Moreover, the parties have not cited, nor have we found, anything in the governing statutes or regulations, or in the record, to suggest that a school district is precluded from using a portion of the program funds obtained from the state to pay associated notice and agenda costs. As noted above, under the Chacon-Moscone Bilingual-Bicultural Education program (Ed. Code, § 52168, subd. (b)(6)), such authority has been granted. As to three of the remaining programs here at issue, such authority also is explicit, or at least strongly implied. (See 20 U.S.C. § 7425(d) [federal Indian Education Program]; Ed.

Code, §§ 63000, subds. (c), (g), 63001 [school improvement program and McAteer Act].) We do not perceive any reason why the Legislature would contemplate a different rule for any of the other programs here at issue, and claimants have advanced no such reason.[21]

As to each of the optional funded programs here at issue, school districts are, and have been, free to decide whether to (i) continue to participate and receive program funding, even though the school district also must incur program-related costs associated with the notice and agenda requirements, or (ii) decline to participate in the funded program. Presumably, a school district will continue to participate only if it determines that the best interests of the district and its students are served by participation—in other words, if, *on balance*, the funded program, even with strings attached, is deemed beneficial. And, presumably, a school district will decline participation if and when it determines that the costs of program compliance outweigh the funding benefits.

In essence, claimants assert that their participation in the education-related programs here at issue is so beneficial that, as a practical matter, they feel they must participate in the programs, accept program funds, and—by virtue of Government Code section 54952 and Education Code section 35147— incur expenses necessary to comply with the procedural conditions imposed on program participants. Although it is completely understandable that a participant in a funded program may be disappointed when additional requirements (with their attendant costs) are imposed as a condition of

---

[21]Nor is there any reason to believe that expenditure of granted program funds on the notice and agenda costs at issue would violate any spending limitation set out in applicable regulations or statutes. Claimants assert that with regard to the school improvement programs, state regulations (Cal. Code Regs., tit. 5, §§ 3900, subd. (b), 3947, subd. (a)) limit spending on administrative expenses to no more than 3 percent of granted program funds. As the Department observes, applicable statutory provisions appear to set the limit for such expenses for the *same* program at no more than 15 percent of granted program funds. (See Ed. Code, §§ 63000, subd. (c), 63001.) But even assuming, for purposes of analysis, that the regulations apply with regard to this program, claimants have made no showing that the notice and agenda costs here at issue exceed 3 percent of granted program funds. As noted *ante*, at page 732, statewide program grants for the school improvement programs alone amounted to approximately $394 million in fiscal year 1998-1999. According to the Commission, state-wide notice and agenda costs for *all nine* of the programs here at issue amounted to only $5.2 million during that same period. (See Com. on State Mandates, Adopted Statewide Cost Estimate, Dec. 13, 2001, p. 1.)

Similarly, claimants have not demonstrated that the notice and agenda costs here at issue exceed the administrative costs spending limitations set for the federal Indian Education Program (see 20 U.S.C. § 7425(d) [5 percent limitation]) and for the McAteer Act's "compensatory education programs" (see Ed. Code, §§ 63000, subd. (g), 63001 [15 percent limitation].)

continued participation in the program, just as such a participant would be disappointed if the total amount of the annual funds provided for the program were reduced by legislative or gubernatorial action, the circumstance that the Legislature has determined that the requirements of an ongoing elective program should be modified does not render a local entity's decision whether to continue its participation in the modified program any less voluntary.[22] (See *County of Sonoma, supra,* 84 Cal.App.4th 1264 [art. XIII B, § 6, provides no right of reimbursement when the state *reduces* revenue granted to local government].) We reject the suggestion, implicit in claimants' argument, that the state cannot legally provide school districts with funds for voluntary programs, and then effectively reduce that funding grant by requiring school districts to incur expenses in order to meet conditions of program participation.

In sum, the circumstances presented in the case before us do not constitute the type of nonlegal compulsion that reasonably could constitute, in claimants' phrasing, a "de facto" reimbursable state mandate. Contrary to the situation that we described in *City of Sacramento, supra,* 50 Cal.3d 51, a claimant that elects to discontinue participation in one of the programs here at issue does not face "certain and severe . . . penalties" such as "double . . . taxation" or other "draconian" consequences (*id.,* at p. 74), but simply must adjust to the withdrawal of grant money along with the lifting of program obligations. Such circumstances do not constitute a reimbursable state mandate for purposes of article XIII B, section 6.

IV

For the reasons stated, we conclude that claimants have failed to establish that they are entitled to reimbursement under article XIII B, section 6, of the California Constitution, with regard to any of the program costs here at issue.

---

[22]Claimants assert that the notice and agenda requirements were imposed for the first time by Government Code section 54952 and Education Code section 35147 in the mid-1990's— "*after* the school districts decided to participate in the programs listed in Education Code section 35147." Even if we assume, contrary to the opposing position of the Department of Finance, that claimants first were subjected to notice and agenda requirements only after their respective school districts elected to participate in the programs, a school district's *continued* participation in the programs would be no less voluntary. As noted above, school districts have been, and remain, legally free to decline to continue to participate in the eight programs here at issue.

The judgment of the Court of Appeal is reversed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.