# IN THE SUPREME COURT OF CALIFORNIA

COAST COMMUNITY COLLEGE DISTRICT et al.,
Plaintiffs and Appellants,

v.

COMMISSION ON STATE MANDATES,
Defendant and Respondent;

DEPARTMENT OF FINANCE,
Real Party in Interest and Respondent.

S262663

Third Appellate District
C080349

Sacramento County Superior Court
34-2014-80001842CUWMGDS

---

August 15, 2022

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Jenkins, and Guerrero concurred.

Justice Liu filed a concurring opinion.

---

COAST COMMUNITY COLLEGE DIST.

v. COMMISSION ON STATE MANDATES

S262663


Opinion of the Court by Groban, J.


Article XIII B, section 6 of the California Constitution requires the state to reimburse local governments "[w]henever the Legislature or any state agency mandates a new program or higher level of service . . . ."  (Cal. Const., art. XIII B, § 6, subd. (a).)  In this case, several community college districts seek reimbursement for regulations that specify various conditions the districts must satisfy to avoid the possibility of having their state aid withheld.  The conditions describe standards governing several core areas of community college administration, including matriculation requirements, hiring procedures, and curriculum selection.

The districts filed a claim with the Commission on State Mandates, " ' "a quasi-judicial body [that] has the sole and exclusive authority to adjudicate whether a state mandate exists" ' " (*California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1200; see Gov. Code, § 17551), arguing that reimbursement was required under Article XIII B, section 6 because:  (1) the regulations imposed a legal duty to satisfy the conditions described therein ("legal compulsion"); or (2) the regulations otherwise compelled compliance as a practical matter ("practical compulsion").  (See *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727, 741 (*Kern*) ["reimbursable state mandate arises" when

1

entity is compelled to comply; distinguishing legal and practical compulsion]; *Department of Finance v. Commission on State Mandates* (2009) 170 Cal.App.4th 1355, 1365–1366 (*Department of Finance*) [reimbursement not required "if a local government participates 'voluntarily,' i.e., without legal compulsion or compulsion as a practical matter, in a program with a rule requiring increased costs"].)

The Commission rejected the claims, concluding that the districts had failed to show they were legally compelled to comply with the regulations because there was no provision creating a mandatory duty that they do so; instead, noncompliance merely raised the possibility that some portion of their state funding would be withheld. The Commission further concluded that the districts had failed to establish they were compelled to comply as a practical matter, explaining that no evidence had been submitted demonstrating the districts were unable to function without state funding or that they otherwise lacked any true choice but to comply with the conditions.

In subsequent mandate proceedings, the trial court affirmed the Commission's findings with respect to both legal and practical compulsion. The Court of Appeal reversed, concluding that the districts were legally compelled to comply with the regulations because those regulations "apply to the underlying core functions of the community colleges, functions compelled by state law." The court also rejected the Commission's finding that legal compulsion was inapplicable because noncompliance merely placed the districts at risk of having some portion of their state aid withheld. According to the court, state laws that required the funding of community

colleges and other evidence in the record demonstrated the districts rely on state aid to function, leaving them no choice but to comply with the regulations. Having found the districts had a legal duty to comply with the regulations, the court declined to review the trial court's conclusion that the districts had failed to show practical compulsion.

We reverse. Contrary to the Court of Appeal's interpretation, the fact that the standards set forth in the regulations relate to the districts' core functions (matriculation, hiring of faculty and selecting curriculum, etc.) does not in itself establish that the districts have a mandatory legal obligation to adopt those standards. (See *Kern, supra*, 30 Cal.4th at p. 741.) The regulations make clear that if a district fails to comply, the California Community Colleges Chancellor has discretion to pursue any number of remedial measures that range from taking no action to "withhold[ing] or reduc[ing] all or part of the district's state aid." (Cal. Code Regs., tit. 5, § 51102, subd. (b)(5).) Thus, the districts are not legally obligated to adopt the standards described in the regulations, but rather face the risk of potentially severe financial consequences if they chose not to do so. Because the regulations induce rather than obligate compliance, legal compulsion is inapplicable. (See *Kern, supra,* 30 Cal.4th at p. 742 [legal compulsion applicable when a local entity "has a legal obligation" to comply].)

Moreover, while the Court of Appeal appears to have reasoned that the districts have no true choice to comply with the regulations insofar as they depend on state aid to function, those arguments sound in *practical*, rather than *legal*, compulsion. (See generally *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 74 (*City of Sacramento*) [finding

practical compulsion where "[t]he alternatives were so far beyond the realm of practical reality that they left the state 'without discretion' to depart from federal standards"].) Because the Court of Appeal chose not to address whether the districts established practical compulsion, we will remand the matter to allow the court to evaluate that issue in the first instance.

## I. BACKGROUND

### A. *Summary of Applicable Statutes*

#### *1. Proposition 4 and implementing legislation*

"Article XIII A (adopted by the voters in 1978 as Proposition 13), limits the *taxing* authority of state and local government. Article XIII B (adopted by the voters in 1979 as Proposition 4) limits the *spending* authority of state and local government." (*Kern, supra*, 30 Cal.4th at p. 735.)

Section 6 of article XIII B provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service." The purpose of section 6 "is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81 (*County of San Diego*).)

In 1984, the Legislature adopted statutory procedures for determining whether a statute or executive action (which includes executive orders and regulations) imposes state-

mandated costs on a local agency. (See Gov. Code, § 17500 et seq.) That legislation provides a two-step procedure. First, a local agency seeking reimbursement must file a "test claim" with the Commission on State Mandates, a quasi-judicial body established to "hear and decide" such matters. (*Id.*, § 17551, subds. (a)–(b).) The test claim process allows the claimant and other interested parties to present written evidence and testimony at a public hearing. (*Id.*, § 17553, subd. (a)(1)); see Cal. Code Regs., tit. 2, § 1183.1, subd. (b) [authorizing multiple claimants "to file a test claim as a joint effort" and providing that "[o]ther similarly situated affected agencies may participate in the process"].) Based on that evidence, the Commission must decide whether the challenged statute or executive order mandates a new program or increased level of service.

In making that determination, the Commission is required to address a series of questions. First, it must decide whether the legal provision for which subvention is sought compels the local agency to act or merely invites voluntary action. If the provision compels action, the Commission must next decide whether the compelled activity requires the agency to provide "a new program or higher level of service." (Cal. Const., art. XIII B, § 6.) Finally, if the Commission finds a statute or executive action mandates a new program or higher level of service, it must consider if any of the enumerated exceptions to reimbursement apply.[1] This case involves only the

---

[1]   Those exceptions include, among other things: (1) when the state has imposed the new program or service to comply with a federal mandate; (2) when the state has provided the local agency offsetting savings that are commensurate with costs of

first of those inquiries: whether the regulations at issue compel community college districts to act or, alternatively, merely invite voluntary action.

If the Commission ultimately determines there is a reimbursable mandate, it must then "determine the amount to be subvened to local agencies and school districts for reimbursement. In so doing it shall adopt parameters and guidelines for reimbursement of any claims relating to the statute or executive order." (Gov. Code, § 17557, subd. (a); see *County of San Diego*, *supra*, 15 Cal.4th at p. 81.)

### 2. *Statutes and regulations governing community colleges*

California community colleges offer two-year degree programs and other forms of instruction. There are currently 73 community college districts that collectively operate 116 community colleges. Each community college district is run by a board of trustees (district board) (see Ed. Code, § 70902, subd. (a)(1)) that is responsible for "establish[ing], maintain[ing], operat[ing], and govern[ing] [the community colleges it oversees] in accordance with law." (*Ibid.*) Under what is commonly referred to "as the 'permissive code' concept" (*Service Employees Internat. Union v. Board of Trustees* (1996) 47 Cal.App.4th 1661, 1666), district boards are permitted to "initiate and carry on any program, activity, or may otherwise act in any manner that is not in conflict with . . . any law and that is not in conflict with the purposes for which community

---

the new program or service; or (3) when the local agency is authorized to fund the new program or service by imposing fees or assessments. (See Gov. Code, § 17556.)

college districts are established." (Ed. Code, § 70902, subd. (a)(1).) Thus, the "only limitation placed on a [district] board's authority under the permissive code is that the board may not act in any manner" that is inconsistent with any law. (*Service Employees Internat. Union,* at p. 1666.)

The Legislature has, however, cabined the authority of district boards in some ways. Education Code section 66010.4, subdivision (a), for example, sets forth the general mission and functions of the community colleges, requiring that they: "offer academic and vocational instruction . . . through, but not beyond, the second year of college" (*id.*, subd. (a)(1)); offer courses to provide "remedial instruction for those in need of it" (*id.*, subd. (a)(2)(A)); "instruct[] in English as a second language" (*ibid.*); and offer "adult noncredit instruction" (*ibid.*).

The Legislature has assigned general oversight authority of the districts to the Board of Governors of the California Community Colleges (the Board of Governors), which enacts regulations and reviews major decisions of community college districts, such as the creation of new colleges. (See Ed. Code, § 70901, subd. (b).) The Board of Governors is headed by the California Community Colleges Chancellor, who is responsible for carrying out and enforcing the Board's regulations and overseeing the annual apportionment of state funds.

In 1988, the Legislature passed new statutory directives requiring the Board of Governors to establish two categories of regulations. (See Stats. 1988, c. 973, § 8 [adding Ed. Code, § 70901].) First, the Board was required to adopt regulations establishing "minimum standards as required by law" for various aspects of community college operations. (Ed. Code, § 70901, subd. (b)(1).) Those regulations (hereafter operating

standards regulations) set out mandatory "minimum standards" related to (among other things) "graduation requirements," "the employment of academic and administrative staff," student discipline, and curriculum. (*Ibid.*; see also Cal. Code Regs., tit. 5, §§ 53000–59606.)[2]

The Legislature also directed the Board of Governors to adopt separate regulations that "[e]stablish minimum conditions entitling districts to receive state aid for support of community colleges" and to adopt procedures to "periodic[ally] review" whether each district has met those minimum conditions. (Ed. Code, § 70901, subd. (b)(6)(A); see Cal. Code Regs., tit. 5, § 51000.) Pursuant to those provisions, the Board passed 19 regulations (see Cal. Code Regs., tit. 5, §§ 51002–51027; hereafter funding entitlement regulations), many of which overlap with (and in some cases directly incorporate) requirements set forth in the operating standards regulations.[3]

---

[2]    Except where otherwise noted, all further references to "Regulation" or  "Regulations" are to title 5 of the California Code of Regulations.

[3]    Regulation 51002, for example, directs the districts to "adopt regulations consistent with the standards of scholarship contained in articles 2 through 5 (commencing with section 55020) of subchapter 1 of chapter 6" of the Regulations, which refers to the operating standards regulations that govern scholarship. Similarly, Regulation 51004 directs the districts to "adopt regulations consistent with regulations contained in articles 6 and 7 (commencing with section 55060) of subchapter 1 of chapter 6," which refers to the operating standards regulations that govern the issuance of degrees and certificates. As discussed in more detail below (see *post*, at pp. 13–14), the

Unlike the operating standards regulations, the districts are not expressly required to comply with the funding entitlement regulations.  Instead, the Education Code and its implementing regulations provide that noncompliance authorizes the Chancellor to initiate a process that may result in withholding or reduction of state funding.  (See Ed. Code, § 70901, subd. (b)(6); Cal. Code Regs., tit. 5, §§ 51000, 51102.)  If the Chancellor determines a district is out of compliance with some or all of the funding entitlement regulations, she must provide the district notice identifying the noncompliance issues and request a response.  (See Cal. Code Regs., tit. 5, § 51102, subd. (a).)  Once the district responds (or time has lapsed to do so), the Chancellor "shall pursue one or more . . . courses of action" that include (among other things) accepting the district's response, requiring the district to adhere to a remedial plan or "withhold[ing] or reduc[ing] all or part of the district's state aid."  (Cal. Code Regs., tit. 5, § 51102, subd. (b).)  The regulations further require that the remedy the Chancellor selects "shall be related to the extent and gravity of noncompliance."  (*Id.*, subd. (c).)

## B.  Procedural History

### 1.  *The Commission's resolution of the test claims*

In June 2003, the Los Rios, Santa Monica, and West Kern community college districts filed test claims seeking reimbursement for costs associated with 27 sections of the Education Code and approximately 140 related regulations.

Court of Appeal's decision found that numerous other provisions in the funding entitlement regulations overlap with requirements in the operating standards regulations.

The test claims included (among other provisions) the operating standards regulations and the funding entitlement regulations. After nearly a decade of review, the Commission issued a 164-page statement of decision that authorized reimbursement for over 90 of the alleged mandates, many of which related to the operating standards regulations implemented pursuant to Education Code section 70901, subdivision (b)(1). The Commission later adopted parameters and guidelines for the reimbursement of those mandates.

However, the Commission rejected all claims related to the funding entitlement regulations, concluding that the districts had failed to establish those regulations compelled them to take any action. The Commission reasoned that unlike the operating standards regulations, compliance with the funding entitlement regulations was not legally mandated, but instead operated to remove the possibility that the Board of Governors might withhold some portion of the noncomplying district's state aid. The Commission further explained that the regulations provided the Chancellor and the Board of Governors discretion to choose what "actions to take" in response to a district's noncompliance, meaning that a district might still retain all its aid even if it chose not to comply. The Commission noted that the districts' evidence showed only one case in which the Chancellor had ever recommended that the Board of Governors withhold funding from a district, which occurred after the San Mateo Community College had failed to comply with an equal opportunity hiring regulation when choosing its new superintendent. The Board, however, ultimately rejected the Chancellor's recommendation to withhold funding and chose instead to increase monitoring over the district. The

Commission concluded the case demonstrated that while "there is . . . a possible loss of funding, [there is no] . . . evidence of the certainty of this loss."

### 2. *The trial court's ruling*

The districts filed a writ petition seeking reversal of the Commission's finding that the funding entitlement regulations did not qualify as a mandate. Although the Department of Finance (the Department) joined the Commission in opposing the petition, the Department chose not to seek review of the portion of the Commission's decision finding that over 90 statutes and regulations (including most of the operating standards regulations) qualified as reimbursable mandates.

The trial court affirmed the Commission's decision and adopted most of its reasoning. The court concluded that the districts "are not legally compelled to comply with the minimum conditions. Instead, . . . [they] only have to comply with the minimum conditions if they want to become entitled to receive state aid." (Italics omitted.) The court also rejected the districts' assertion that even if not legally compelled to comply, they were nonetheless practically compelled to do so "because they cannot operate without state funding and thus have no meaningful choice but to comply with the minimum conditions." The court explained that it could not evaluate that assertion because the districts had "cite[d] no evidence in their briefs about how much community colleges receive from state aid, how much they receive from property taxes, and how much they receive from other funding sources. . . . With no evidence on this issue, . . . [the districts] fail to prove the key point (i.e., that they cannot operate without state funds)." (Italics omitted.)

The trial court further concluded that even if there were sufficient evidence to support a finding that the districts relied on state funds to operate, the districts had failed to show that noncompliance was reasonably likely to result in the withholding of state funds. The court reasoned that while the funding entitlement regulations authorized the Chancellor "to withhold state aid if a district fails to comply," the districts had not proved that "loss of state aid is . . . reasonably certain to occur" or that the amounts withheld would necessarily be "severe." Like the Commission, the trial court cited evidence regarding the disciplinary action the Board of Governors had taken against San Mateo Community College District for failing to comply with funding entitlement regulations related to equal opportunity hiring. The trial court noted that the Board's meeting minutes showed it had rejected the Chancellor's recommendation to withhold $500,000 in state aid because "of the worry that doing so would negatively impact students." In the court's view, these actions showed that it was "unlikely that a district would actually lose any state aid if it failed to comply with the minimum conditions."

### 3. *The Court of Appeal's partial reversal*

The Court of Appeal reversed in part, concluding that the districts had shown they were legally compelled to comply with the funding entitlement regulations because those regulations related to the community college districts' core functions: "[T]he [funding entitlement regulations] apply to the underlying core functions of the community colleges, functions compelled by state law. . . . California community colleges are required to provide specified academic, vocational, and remedial instruction, along with support services. (Ed. Code, § 66010.4.)

The [funding entitlement regulations] direct the community college districts to take specific steps in fulfilling those legally-compelled core mission functions, including requirements pertaining to scholarship, degrees, courses, campuses, counseling, and curriculum."

The court further concluded that while the Commission had found "the [funding entitlement regulations] are not legally compelled because the community colleges are free to decline state aid," that conclusion was "inconsistent with the statutory scheme and the appellate record." The court explained that the California Constitution requires "a specific minimum level of state General Fund revenues be guaranteed and applied for the support of community college districts" and further requires that the state provide districts sufficient funding "to permit them to carry out their mission." Without citing a specific source, the court noted that "in the most recent year for which the appellate record in this case provides information, more than half of California community college funding came from the state General Fund. In that same year, other funding sources, including federal funds, local funds, and student fees, provided significantly less support. Like public school districts in general, community college districts are dependent on state aid." (Italics omitted.) Because the court found that the districts were legally compelled to comply with the funding entitlement regulations, it declined to address the trial court's alternative finding that the districts had failed to demonstrate they "faced practical compulsion based on severe and certain penalties."

The Court of Appeal went on to rule, however, that the districts were not entitled to reimbursement for many of the

funding entitlement regulations because the programs or services described within those regulations were duplicative of requirements imposed under the operating standards regulations, which the Commission had previously found to be reimbursable. In total, the Court of Appeal found that only six of the nineteen funding entitlement regulations involved programs or services that did not overlap with operating standards regulations or other statutory requirements the Commission had already found to be reimbursable. For those six regulations, the court remanded the matter back to the Commission to evaluate whether they imposed a new program or higher level of service within the meaning of the mandate law.

The Commission and the Department (collectively respondents) filed petitions for review challenging the Court of Appeal's conclusion that the districts were legally compelled to comply with the funding entitlement regulations.[4]

---

[4] The Commission has also requested review of a separate portion of the Court of Appeal's decision that directs the Commission to make further findings regarding the districts' entitlement to reimbursement for various sections of the Education Code that are unrelated to the regulations discussed above. The Commission asserts it lacks fundamental jurisdiction to address those sections of the Education Code because: (1) the districts' test claims do not expressly reference those statutes; and (2) some of those statutes were the subject of a prior test claim. The Department, which has not joined in this argument, is of the view that while a claimant might be procedurally barred from seeking reimbursement for statutes that were not listed in a test claim or were the subject of a prior test claim, those circumstances do not result in a jurisdictional bar.

## II. DISCUSSION

### A. Standard of Review

"Courts review a decision of the Commission to determine whether it is supported by substantial evidence. [Citation.] Ordinarily, when the scope of review in the trial court is whether the administrative decision is supported by substantial evidence, the scope of review on appeal is the same. [Citation.] However, the appellate court independently reviews conclusions as to the meaning and effect of constitutional and statutory provisions. [Citation.] The question whether a statute or executive order imposes a mandate is a question of law. [Citation.] Thus, we review the entire record before the Commission . . . and independently determine whether it supports the Commission's conclusion that the conditions here were not . . . mandates." (*Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, 762.)

### B. Analysis

Respondents argue the Court of Appeal erred in finding the districts were legally compelled to comply with the funding entitlement regulations. They further contend that although the Court of Appeal did not reach the issue, we should additionally find that the districts failed to establish they were practically compelled to comply with those regulations.

---

Although the Commission's arguments regarding this secondary issue fall within the scope of our order granting review, we decline to address them. (Cal. Rules of Court, rule 8.516(b)(3) ["The court need not decide every issue the parties raise or the court specifies"].)

### 1. *Distinction between legal compulsion and practical compulsion*

When evaluating whether a statute or executive action compels compliance for purposes of subvention claims, we have identified two distinct theories of mandate: legal compulsion and practical compulsion. Legal compulsion occurs when a statute or executive action uses mandatory language that " 'require[s]' or 'command[s]' " a local entity to participate in a program or service. (*Kern, supra*, 30 Cal.4th at p. 741; see *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155, 174 [construing the term "mandates" in art. XIII B, § 6 to mean " 'orders' or 'commands' "].) Stated differently, legal compulsion is present when the local entity has a mandatory, legally enforceable duty to obey. This standard is similar to the showing necessary to obtain a traditional writ of mandate, which requires the petitioning party to establish the respondent has "a clear, present, and usually ministerial duty to act. . . . Mandate will not issue if the duty is . . . mixed with discretionary power." (*Los Angeles County Prof. Peace Officers' Assn. v. County of Los Angeles (*2004) 115 Cal.App.4th 866, 869.)

Thus, as a general matter, a local entity's voluntary or discretionary decision to undertake an activity cannot be said to be legally compelled, even if that decision results in certain mandatory actions. In *Kern, supra*, 30 Cal.4th 727, for example, we held that school districts were not entitled to reimbursement for costs associated with a law that imposed new requirements related to the administration of certain voluntary, state-funded educational programs. Under the original statutes governing these voluntary educational programs, "participating school districts [we]re granted state or federal funds to operate the

16

program, and [we]re required to establish . . . advisory committees [to] . . . administer the program." (*Id.* at p. 732.) The new law required participating districts to make those advisory committee meetings open to the public and provide the public notice of the meetings and post meeting agendas.

In rejecting the districts' reimbursement claim for those new open meeting requirements, we explained that because the "notice and agenda provisions [were merely] mandatory elements of [voluntary] programs" (*Kern, supra,* 30 Cal.4th at p. 731), the districts were not legally compelled to comply with those provisions. (See *id.* at p. 742 ["activities undertaken at the option or discretion of a local government entity . . . do not trigger a state mandate and hence do not require reimbursement of funds — even if the local entity is obliged to incur costs as a result of its discretionary decision to participate in a particular program or practice"]; but see *San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859, 887 [declining to adopt a bright-line rule precluding reimbursement "whenever an entity makes an initial discretionary decision that in turn triggers mandated costs"].)

*Kern* also discussed the concept of "practical compulsion," a theory of mandate that arises when a statutory scheme does not command a local entity to engage in conduct, but rather induces compliance through the imposition of severe consequences that leave the local entity no reasonable alternative but to comply. (See *Kern, supra,* 30 Cal.4th at pp. 748–752.) Relying on our decision in *City of Sacramento, supra,* 50 Cal.3d 51, the claimants in *Kern* argued that we should construe section's 6's mandate provision (see Cal. Const., art. XIII B, § 6) to encompass both legal and practical

17

compulsion. *City of Sacramento* addressed a different provision in article XIII B — section 9 — which lists various categories of appropriations that are excluded from the spending limitations article XIII B otherwise places on state and local governments. One of those exceptions excludes "[a]ppropriations required to comply with mandates of . . . the federal government." (Cal. Const., art. XIII B, § 9, subd. (b).) As summarized in *Kern*, our decision in *City of Sacramento* examined whether section 9's federal mandate exclusion applied to a federal law that provided substantial tax incentives for states to extend their unemployment insurance programs to cover public employees. To retain these significant tax advantages, our Legislature passed a statute requiring that government entities (including local entities) include their employees within the state unemployment program. The question we had to decide was whether the federal law constituted a "federal mandate," which would mean that local governments could exclude the costs of complying with the new state statute from their constitutional spending limits. (*Kern*, at p. 749.)

Although we found the federal law did not *legally* compel states to extend unemployment insurance coverage to all public employees, we nevertheless concluded that "because the financial consequences to the state and its residents of failing to participate in the federal plan were so onerous and punitive — we characterized the consequences as amounting to 'certain and severe federal penalties' including 'double . . . taxation' and other 'draconian' measures [citation] — as a practical matter, for purposes of article XIII B, section 9, the state was mandated to participate in the federal plan to extend unemployment insurance coverage." (*Kern, supra,* 30 Cal.4th at p. 749

[summarizing *City of Sacramento*]; see *City of Sacramento, supra*, 50 Cal.3d at p. 76 [practical compulsion determination "must depend on such factors as the nature and purpose of the federal program; whether its design suggests an intent to coerce; when state and/or local participation began; the penalties, if any, assessed for withdrawal or refusal to participate or comply; and any other legal and practical consequences of nonparticipation, noncompliance, or withdrawal"].)

The claimants in *Kern, supra*, 30 Cal.4th 727, argued that for purposes of consistency we should likewise construe the state mandate provision in article XIII B, section 6 to encompass both legal and practical compulsion. (See *Kern*, at p. 750 ["claimants argue, the word 'mandate,' used in two separate sections of article XIII B, should not be given two different meanings"].) The Department, however, contended we should interpret section 6's mandate provision more "narrowly . . . to include only programs in which local entities are legally compelled to participate." (*Id.* at p. 751.)

We declined to resolve that issue, explaining that even if we were to assume "that our construction of the term 'federal mandate' . . . applies equally in the context of article XIII B, section 6" (*Kern, supra*, 30 Cal.4th at p. 751), the claimants had failed to identify any " 'certain and severe . . . penalties' " or other " 'draconian' consequences" that "reasonably could constitute . . . a 'de facto' reimbursable mandate." (*Id.* at p. 754.) Rather, the record demonstrated that the new laws merely required each school district to decide whether to continue participating in the voluntary school programs, "even though the school district also must incur program-related costs associated with the notice and agenda requirements . . . .

Presumably, a school district will continue to participate only if it determines that . . . , on balance, the funded program, even with strings attached, is deemed beneficial." (*Id.* at p. 753, italics omitted.)[5]

### 2. *The districts have failed to show legal compulsion*

We first address the Court of Appeal's conclusion that the districts were legally compelled to comply with the funding entitlement regulations. Education Code section 70901, subdivision (b)(6)(A) directs the Board of Governors to "[e]stablish minimum conditions entitling districts to receive state aid for support of community colleges" and to periodically review whether districts are in compliance with those conditions. (See *ante*, at pp. 8–9.) The implementing regulations, in turn, set forth the applicable funding entitlement requirements and describe how the Chancellor is to proceed in the event of noncompliance. The regulations direct that after soliciting a response from a noncompliant district, the

---

[5] While *Kern's* general discussion of the distinction between legal and practical compulsion is helpful for evaluating the parties' arguments in this case, the specific nature of the mandate claim at issue in *Kern* is factually somewhat distinct from the districts' claims here. As discussed above, participation in the underlying school programs that triggered the challenged costs in *Kern* was completely voluntary. (*Kern, supra*, 30 Cal.4th at p. 744.) Thus, nonparticipation in the underlying programs would have left the claimant school districts in the same position they would have been in otherwise, i.e., with no additional costs. By contrast, as discussed in more detail below, the districts here allege that choosing not to comply with the funding entitlement regulations results in unavoidable severe consequences, namely placing their state aid in jeopardy.

Chancellor may pursue a variety of remedies that range from accepting the district's response to an inquiry to withholding some or all of the district's state aid. (See Cal. Code Regs., tit. 5, § 51102, subd. (b).)

We are not persuaded that this enforcement scheme legally compels the districts to comply with funding entitlement regulations. As summarized above, Education Code section 70901, subdivision (b) required the Board of Governors to adopt two distinct sets of regulations: the operating standards regulations that the Commission previously found to impose mandates (see Ed. Code, § 70901, subd. (b)(1)) and the funding entitlement regulations at issue in this case (see Ed. Code, § 70901, subd. (b)(6)). (See *ante*, at pp. 7–9.) Unlike the mandatory language governing the operating standards regulations, which directs the Board to "[e]stablish minimum standards *as required by law*" (Ed. Code, § 70901, subd. (b)(1), italics added) and which requires that districts *shall* establish policies consistent with those standards (see Ed. Code, § 70902, subd. (b) ["board of each community college district shall" establish policies and procedures that are consistent with the operating standards]), Education Code section 70901, subdivision (b)(6) and its implementing regulations contain no language "command[ing]" (*Kern, supra*, 30 Cal.4th at p. 741) that the districts comply with the funding entitlement regulations. Instead, those provisions make clear that districts that fail to comply *may* be subject to certain consequences, the most severe of which is withholding of state funds. (See Ed. Code, § 70901, subd. (b)(6)(A) [directing board to establish minimum conditions "entitling districts to receive state aid"; Cal. Code Regs., tit. 5, § 51102, subd. (b) [describing actions

Board may take in response to noncompliance, including withholding of state aid].)

While the districts argue that the threat of such a penalty effectively forces community colleges to comply with the regulations (an issue discussed in more detail below), there is nothing in the statute or regulations that creates a mandatory legal obligation that they do so, which is the appropriate test for legal compulsion. If a community college district is willing to risk the possibility of losing some or all its state aid, there does not appear to be any mechanism (or at least none the parties have identified) that would allow the Chancellor or any other state entity to compel compliance as a matter of law.[6]

---

[6] At oral argument, counsel for the districts argued that several of the funding entitlement regulations include the word "shall," which is generally indicative of a mandatory duty. (See Cal. Code Regs., tit. 5, §§ 51002 [district "*shall* [¶] . . . adopt regulations consistent with the standards of scholarship contained in articles 2 through 5 (commencing with section 55020)," italics added]; 51004 [district "*shall* [¶] . . . adopt regulations consistent with regulations contained in articles 6 and 7 (commencing with section 55060)," italics added]; 51006 [district "*shall* adopt" a policy making courses open to any enrolled students, italics added].) Those regulations, however, must be read in the context of — and in conjunction with — Education Code section 70901, subdivision (b)(6) and Regulation 51002, which explain the *consequences* of failing to comply with regulations, i.e., the Chancellor and Board of Governors are given discretionary authority to withhold state aid. (See *ante*, at pp. 8–9.) Regardless of whether those consequences are sufficient to support a claim of *practical* compulsion (an issue we do not reach here [see *post* at pp. 27–29]), the risk that funding might be withheld does not create a mandatory legal duty to comply with the regulations, which is the applicable test for

The Court of Appeal reached a different conclusion, finding that the districts were legally compelled to comply with the regulations because the funding entitlement regulations "apply to the underlying core functions of the community colleges, functions compelled by state law." In support, the court cited to Education Code section 66010.4, which describes the "missions and functions" of community colleges, including (among other things) "academic and vocational instruction . . . through but not beyond the second year of college." (Ed. Code, § 66010.4, subd. (a)(1).) In the appellate court's view, the funding entitlement regulations "direct the community college districts to take specific steps in fulfilling those legally compelled core mission functions, including requirements pertaining to scholarship, degrees, courses, campuses, counseling, and curriculum."

We do not dispute that many of the funding entitlement regulations are "in connection with" or relate to the "core functions" that community colleges are required to perform. We are not persuaded, however, that such a relationship is sufficient to establish legal compulsion. As we have previously explained, "[T]he proper focus under a legal compulsion inquiry is upon the nature of claimants' participation in the underlying programs themselves." (*Kern, supra,* 30 Cal.4th at p. 743.) Applying that standard here, the proper inquiry is whether the language of the funding entitlement provisions legally obligates

legal compulsion. (Cf., *Kern, supra,* 30 Cal.4th at p. 745 [regulation directing that school districts "shall" establish certain policies did not create a legal duty where other provisions made clear compliance was only necessary if the school districts chose to participate in a voluntary program].)

the districts to comply with the conditions described therein, not whether those conditions relate to the core functions of the districts. Section 70901, subdivision (b)(6) provides that compliance with the minimum conditions "*entitl[es]* districts to receive state aid" (italics added), while Regulation 51102, subdivision (b) describes the remedial actions the Chancellor may impose in the event of noncompliance, up to and including withholding of state aid. (See Cal. Code Regs., tit. 5, § 51102, subd. (b)(5).) Because these provisions do not create an enforceable obligation to comply with the funding entitlement conditions, but rather describe conditions the districts must satisfy to avoid the possibility of having their state aid reduced or withheld, the enactments are not "mandates" under a legal compulsion theory.

The Court of Appeal also disagreed with the Commission's conclusion that compliance with the funding entitlement regulations is not "legally compelled" because "community colleges are free to decline state aid." In rejecting this argument, the court noted that various statutes and constitutional provisions require the state to provide the community college system sufficient funding to carry out its mission. Without citing a specific source, the court further explained that in the most recent year for which information was available "more than half of California community college funding came from the state General Fund. . . . [while] other funding sources . . . provided significantly less support. (Italics omitted.) Like public school districts in general, community college districts are dependent on state aid."

While the Court of Appeal may be correct that some (if not most) community college districts are heavily reliant on state

aid — and thus have no true alternative but to act in a manner that secures their funding — those arguments sound in *practical* compulsion, rather than legal compulsion.[7]  (See generally *Kern, supra*, 30 Cal.4th at pp. 731, 751 [practical compulsion occurs when the local entity has " 'no true option or choice' "]; *City of Sacramento, supra*, 50 Cal.3d at p. 74 [finding practical compulsion where the consequences of noncompliance "were so far beyond the realm of practical reality that they left the state 'without discretion' to depart from federal standards"].)

The Court of Appeal's reasoning is consistent with the primary argument the districts have raised throughout these proceedings, which also sounds in practical compulsion.  In the trial court, for example, the districts argued that "the most serious error in the [Commission's] decision is the conclusion that the 'minimum conditions' of receiving state aid are not mandates because the Colleges may choose not to receive state funding.  That conclusion is erroneous because the Colleges truly have no meaningful choice [but to comply]."  In support, they cited *City of Sacramento, supra*, 50 Cal.3d 51, a case that turned on practical compulsion.  (See *ante*, at pp. 17–19.)  The districts' briefing in the Court of Appeal contains essentially identical language, asserting that because noncompliance with

---

[7]    The administrative record includes a letter the Chancellor submitted to the Commission in 2008 acknowledging that three (and in some prior years four) community college districts did not receive any general apportionment funding because they derived sufficient revenue from other sources (primarily property tax allocations from their respective counties) to meet their funding needs.  This evidence suggests that some districts may rely on state funding more heavily than others.

the funding entitlement regulations could result in the "drastic loss" of funding necessary "to provide educational services, . . . the [c]olleges have no true choice but to comply." Those same arguments remain central in the districts' briefing before this court, where they again contend that "[t]he most serious error in the . . . Commission decision is . . . the conclusion that the minimum conditions of receiving State aid are not mandates because the [districts] may somehow choose not to receive state funding. This conclusion is erroneous because the [districts] have no true choice. . . . [¶] . . . Put simply, the [districts] contend community colleges cannot function without state aid."[8] Like the Court of Appeal, the districts' focus on the consequences of noncompliance, and the purported absence of any true choice, sounds in practical rather than legal compulsion. That the financial situation of some (or most) districts may leave them with no reasonable alternative but to comply with the funding entitlement regulations does not transform this case into one involving legal compulsion.

In sum, while many of the directives in the funding entitlement regulations relate to the districts' core educational functions, that is insufficient to show legal compulsion. Rather, to establish legal compulsion, the claimants had to show they had a mandatory duty to comply with the regulations. The districts have pointed to no such provision. Instead, they have

---

[8] The districts' answers to respondents' petitions for review likewise focused on the consequences of noncompliance, arguing that they had not "voluntarily" complied with the funding entitlement regulations, but rather were "required to do so at risk of drastic fiscal loss of funds" and had no "true choice" but to comply given their reliance on state aid.

asserted that because they rely on state aid to carry out their core functions, they have no true choice but to comply.  For the reasons discussed above, we conclude that argument should be evaluated under the lens of practical, rather than legal, compulsion.

### 3.   *On remand, the Court of Appeal should consider practical compulsion*

The districts also argue that regardless of whether legal compulsion applies in this case, the record makes clear they were compelled to comply with the funding entitlement regulations as a practical matter.  (See *Kern, supra*, 30 Cal. 4th at p. 731 ["we do not foreclose the possibility that a reimbursable state mandate might be found in  circumstances short of legal compulsion"]; *id*. at p. 736 [leaving open question "whether . . . there are some circumstances in which a state mandate may be found in the absence of legal compulsion"]; *id*. at p. 744; see also *Department of Finance*, *supra*, 170 Cal.App.4th at pp. 1365–1366 ["if a local government participates 'voluntarily,' i.e., without legal compulsion or compulsion as a practical matter, in a program with a rule requiring increased costs, there is no requirement of state reimbursement"].)

The Department, however, contends (as it did in *Kern*) that we should narrowly interpret article XIII B, section 6 to require reimbursement only when a local government has been legally compelled to provide a new program or higher level of service.   (See *Kern, supra*, 30 Cal.4th at p. 736 ["the Department . . . asserts that article XIII B, section 6, reflects an intent on the part of the drafters and the electorate to limit reimbursement to costs that are forced upon local governments

as a matter of legal compulsion"].)  Alternatively, respondents collectively argue that even if practical compulsion is a valid theory of mandate (or is assumed to be so), claimants in this case have failed to introduce any evidence establishing that noncompliance with the applicable regulations is "reasonably certain to [result in] ' "severe," ' ' "draconian" ' consequences." (Quoting *Kern,* at pp. 750–751; see *id.* at p. 751 [finding it "unnecessary to resolve whether" practical compulsion is a valid theory of mandate where claimants had failed to demonstrate noncompliance would result in severe penalties].)  More specifically, respondents contend the districts have failed to show either that noncompliance is likely to result in withholding of a significant amount of state aid,[9] or that the risk of such withholding leaves them with no true alternative but to comply.

Because the Court of Appeal found the districts were compelled to comply with the funding entitlement regulations as a matter of legal compulsion, it chose not to address any of

---

[9]     As noted above, there appears to be substantial overlap between the directives described in the operating standards regulations (which the Commission has already found to qualify as mandates) and those set forth in the funding entitlement regulations.  (See *ante*, at pp. 8, fn. 3; 13–14.)  Thus, while the record before us is not clear on the point, the districts may already be compliant with (and reimbursed for) many or most of the activities described in the funding entitlement regulations.  Given that the funding entitlement regulations direct that any remedy the Chancellor chooses to impose must relate to the "extent and gravity of noncompliance" (Cal. Code Regs., tit. 5, § 51102, subd. (c)), the fact that districts may already be compliant with (and compensated for) many of the conditions described in the funding entitlement regulations could be relevant to determining the appropriate remedy, including the size and scope of any withholding.

the parties' arguments regarding practical compulsion (also referred to as "nonlegal compulsion" [*Kern, supra*, 30 Cal.4th.at p. 754]).  Having now rejected the Court of Appeal's conclusion regarding legal compulsion, we find it "appropriate to remand for the [court] to resolve . . . in the first instance" whether the districts may be entitled to reimbursement under a theory of nonlegal compulsion.  (*Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1149 ["It is appropriate to remand for the Court of Appeal to resolve . . . in the first instance" issues that the court chose "not [to] reach because of its holdings"]; see *People v. Goolsby* (2015) 62 Cal.4th 360, 368 [reversing finding that Pen. Code, § 654 barred retrying defendant for a lesser offense and remanding with directions that appellate court "decide . . . in the first instance" the unresolved question of whether retrial was barred under double jeopardy principles]; see *Central Coast Forest Assn. v. Fish & Game Com.* (2017) 2 Cal.5th 594, 606; *In re Manuel G.* (1997) 16 Cal.4th 805, 820.)[10]

---

[10]    The concurrence agrees that the Court of Appeal erred in finding the statutes and regulations the parties have relied on throughout this litigation (namely Education Code section 70901, subdivision (b)(6) and Regulation 51102) legally compel the districts to comply with the funding entitlement regulations. Rather than remand the matter to address only practical compulsion, however, the concurrence would remand with directions that the appellate court also consider whether a different section of the Education Code, section 70902, might be interpreted to legally compel the districts to comply with the challenged regulations.  The success or failure of such an argument, the concurrence explains, would appear to turn on whether there may be another "enforcement mechanism" apart from the provisions in Regulation 51102 that could be used to compel the districts to comply with the funding entitlement

## III. DISPOSITION

The Court of Appeal's judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

---

regulations. (See conc. opn. of Liu, J, *post*, at pp. 3–5.) The concurrence identifies no such alternative mechanism, but hypothesizes that because one might exist, we should provide the parties an opportunity to explore the issue further.

As the concurrence expressly acknowledges, no party has ever presented such a theory at any point during this litigation, which has now been ongoing for almost two decades. (See conc. opn. of Liu, J, *post*, at p. 5.) From the start of the proceedings, the districts' reimbursement claim has focused on Education Code section 70901 and its implementing regulations. That is not particularly surprising given that section 70901 is the statute that describes (and distinguishes) the operating standards regulations and the funding entitlement regulations. In any event, as a court of review, our role is to evaluate the arguments the parties have presented, not "construct [alternative] theor[ies that might be] supportive" of their claims. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; see also *In re Harris* (2021) 71 Cal.App.5th 1085, 1100 ["it is not our role to make arguments for petitioner or to consider arguments not raised or . . . addressed below," fn. omitted]; cf. *Jibilian v. Franchise Tax Bd.* (2006) 136 Cal.App.4th 862, 866, fn. 3 ["it is not our role to construct theories or arguments that would undermine the judgment"].) Accordingly, we decline to direct the Court of Appeal to consider undeveloped legal theories that neither party has advocated for.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**JENKINS, J.**
**GUERRERO, J.**

COAST COMMUNITY COLLEGE DIST.

v. COMMISSION ON STATE MANDATES

S262663

Concurring Opinion by Justice Liu

The Court of Appeal in this case concluded that community college districts are legally compelled to comply with the regulations setting forth the "minimum conditions entitling districts to receive state aid" (Ed. Code, § 70901, subd. (b)(6)(A)) based on its view that the regulations "direct the community college districts to take specific steps in fulfilling th[eir] legally-compelled core mission functions." I agree with today's opinion that the Court of Appeal's reasoning and conclusion are incorrect, and I therefore concur in the judgment of reversal. However, given the way the parties argued this case, I do not think we have enough information to conclude that the minimum conditions are not legally compelled. I would remand for further consideration of this issue in light of the relevant statutory and regulatory provisions.

## I.

This case concerns the legal obligations of California's community college districts. Two sets of potential obligations are at issue: "minimum standards" and "minimum conditions." (Ed. Code, § 70901, subd. (b)(1), (b)(6).) These two sets of regulations describe a variety of requirements related to community colleges' operations and academic offerings, and they overlap substantially.

It is uncontested that the community college districts are legally obligated to comply with the minimum *standards*, making costs incurred in compliance with those regulations subject to reimbursement under provisions added to the California Constitution by Proposition 13. (See *Dept. of Finance v. Com. on State Mandates* (2003) 30 Cal.4th 727, 743 [costs that are "legally compelled . . . constitute reimbursable state mandates"].) The court below determined that the districts are legally compelled to comply with the minimum *conditions* regulations as well. We are asked to review that decision.

The Education Code tells us where to look to understand the legal obligations of community college districts. Section 70900 of the Education Code says that "local districts shall carry out the functions specified in Section 70902." (Ed. Code, § 70900.) Section 70902 of the Education Code (section 70902) then sets forth in detail the obligations of community college districts. Certain provisions of that section specifically instruct districts to comply with at least some of the minimum standards. For instance, subdivision (b) states that "each community college district shall [¶] . . . [¶] [e]stablish academic standards, probation and dismissal and readmission policies, and graduation requirements not inconsistent with the minimum standards" and shall "[e]mploy and assign all personnel not inconsistent with the minimum standards." (Ed. Code, § 70902, subd. (b), (b)(3), (b)(4).)

Section 70902 does not specifically mention the minimum conditions. But several provisions of section 70902 appear to create broad legal requirements for community college districts that might include compliance with those regulations. For example, subdivision (a)(2) says districts "shall establish rules and regulations not inconsistent with the regulations of the

board of governors," the state's supervisory entity that issues both the minimum standards and minimum conditions regulations. (Ed. Code, § 70902, subd. (a)(2); see also § 70901, subd. (b)(1), (6) [requiring board of governors to establish minimum standards and minimum conditions].) Section 70902 also requires districts to initiate and operate their programs in ways that are "not in conflict with or inconsistent with, or preempted by, any law and that [are] not in conflict with the purposes for which community college districts are established." (Ed. Code, § 70902, subd. (a)(1).) These provisions could be read to require community colleges to comply with some or all of the specific requirements of the minimum conditions regulations.

Because this statutory language is not free of ambiguity, we look to applicable regulations to discern what consequences may flow from noncompliance with the minimum conditions in order to decide whether they are legally compelled. Sections 51100 and 51102 of title 5 of the California Code of Regulations govern the investigation and enforcement of the minimum conditions. When a district is found to be in noncompliance with the minimum conditions, section 51102 describes several penalties that may be imposed, which include withholding or reduction of state funding. (Cal. Code Regs., tit. 5, § 51102, subd. (b).) But section 51100 further instructs that "[t]he enforcement procedures and remedies set forth in this subchapter are in addition to any and all other enforcement mechanisms and remedies provided by law for violation of the provisions of this chapter" (i.e., the minimum conditions). (Cal. Code Regs., tit. 5, § 51100, subd. (d).)

Section 51100 does not say what other enforcement mechanisms and remedies are available for violations of the minimum conditions. And we have received no briefing or

argument about what legal obligations related to the minimum conditions may be imposed by section 70902 or what enforcement mechanisms besides withholding of funds are contemplated by section 51100. Without further information about the meaning of those provisions, I do not see how we can determine whether compliance with the minimum conditions is legally compelled.

## II.

Today's opinion focuses instead on the language of section 70901 of the Education Code, the part of the Code that describes the obligations of the state board of governors. (See Ed. Code, § 70900 ["The board of governors shall carry out the functions specified in Section 70901, [and] local districts shall carry out the functions specified in Section 70902 . . . ."].) The court reasons that because subdivision (b)(6) of section 70901 "and its implementing regulations contain no language 'command[ing]' [citation] that the districts comply with the [minimum conditions] regulations," compliance with the minimum conditions is not compelled by statute. (Maj. opn., *ante*, at p. 21.)

But, as noted, section 70901 does not set forth the legal duties of community college districts; it addresses the duties of the state board of governors. The statute that describes the legal responsibilities of community college districts is section 70902, which today's opinion does not consider in its assessment of the minimum conditions.

Further, the court explains the procedure under section 51102 of the regulations by which state funding may potentially be withheld from districts for noncompliance with the minimum conditions. It then declares that this is "the most

4

severe" consequence for noncompliance. (Maj. opn., *ante*, at p. 21.) If that were true, I would agree that the consequences for noncompliance with the minimum conditions are insufficient to impose a legal mandate. But we do not know whether withholding of funds is "the most severe" consequence districts may face. The court does not discuss section 51100, subdivision (d) — the regulation that makes that consequence nonexclusive — nor do we have any information about what other consequences are authorized by the regulations.

The parties have not supplied briefing or argument on the language in section 70902 that may obligate districts to follow the minimum conditions or the provision of section 51100 of the regulations that makes withholding of funds a nonexclusive remedy for noncompliance. They have focused instead on the language of section 70901, as the court does. But we must consider all relevant provisions before reaching a conclusion as to whether compliance with the minimum conditions is legally compelled. Indeed, the fact that neither the parties nor the courts below have discussed section 70902 or section 51100 is exactly why I would not go as far as the court does today. (Cf. maj. opn., *ante*, at pp. 29–30, fn. 10.) I would hold only that the Court of Appeal's analysis was incorrect and remand for that court to consider in the first instance any other theories of legal or practical compulsion, including any mandate that may be imposed by section 70902 or section 51100. Without due consideration of those provisions, I would not hold, as today's opinion does, that community college districts are not legally compelled to comply with the minimum conditions.

I concur only in the judgment of reversal.

**LIU, J.**

5

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Coast Community College District v. Commission on State Mandates

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 47 Cal.App.5th 415
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S262663
**Date Filed:**  August 15, 2022

_____

**Court:**  Superior
**County:**  Sacramento
**Judge:**  Christopher E. Krueger

_____

**Counsel:**

Dannis Woliver Kelley, Christian M. Keiner, William B. Tunick, Juliane S. Rossiter, Chelsea Olson Murphy and Chelsea A. Tibbs for Plaintiffs and Appellants.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Plaintiffs and Appellants.

Lozano Smith, Sloan R. Simmons, Nicholas J. Clair; and Robert Tuerck for California School Boards Association's Education Legal Alliance as Amicus Curiae on behalf of Plaintiffs and Appellants.

Juliana F. Gmur and Camille Shelton for Defendant and Respondent.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Matthew Rodriquez, Acting Attorney General, Michael J. Mongan, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Douglas J. Woods and Thomas S. Patterson,

Assistant Attorneys General, Samuel T. Harbourt, Deputy State Solicitor General, Paul Stein, Tamar Pachter and P. Patty Li, Deputy Attorneys General, for Real Party in Interest and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christian M. Keiner
Dannis Woliver Kelley
555 Capitol Mall, Suite 645
Sacramento, CA 95814
(916) 978-4040

Juliana F. Gmur
Senior Commission Counsel
980 9th Street, Suite 300
Sacramento, CA 95814
(916) 323-2611

Samuel T. Harbourt
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3919